Filed 1/4/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| JOHN DOE, | B283406 |
| Petitioner and Appellant, | (Los Angeles County Super. Ct. No. BS157112) |
| v. | |
| KEGAN ALLEE, Ph.D., et al., | |
| Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Howard L. Halm, Judge. Reversed.

Hathaway Parker, Jenna E. Parker and Mark M. Hathaway for Petitioner and Appellant.

Young & Zinn, Julie Arias Young, Karen J. Pazzani; Cole Pedroza, Kenneth R. Pedroza and Cassidy C. Davenport for Respondents.

John Doe, formerly an undergraduate student at the University of Southern California (USC), appeals from the trial court's denial of his petition for writ of administrative mandate, by which Doe sought to set aside his expulsion. (Code Civ. Proc., § 1094.5 (§ 1094.5).) Doe was expelled after respondents Kegan Allee, Ph.D., sued in her official capacity as Title IX Investigator for USC,[1] and, ultimately, Ainsley Carry, Ed.D., in his official capacity as USC's Vice Provost for Student Affairs, found that Doe engaged in nonconsensual sex with another USC student, Jane Roe,[2] in violation of the university's Student Conduct Code.

Doe argues that he was denied a fair hearing because respondents (principally Dr. Allee) were biased, and because USC's student disciplinary procedure is fundamentally flawed, in that it provides no mechanism for a party accused of sexual misconduct to question witnesses before a neutral fact finder vested with power to make credibility determinations. While we conclude that Doe failed to meet his burden of proving respondents were actually biased against him, we nonetheless conclude that USC's disciplinary procedure failed to provide a fair hearing, In that regard, we hold that when

[1]     Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681 et seq.) (Title IX), forbids sex-based discrimination in all schools, colleges and universities that receive federal funding. (See 20 U.S.C. §§ 1681–1688.) Title IX does not specifically address sexual assault, but the United States Supreme Court has held that a school may be liable for discrimination and face, among other things, a loss of federal funding, if it mishandles a student's sexual assault claim. (See *Davis v. Monroe County Bd. of Educ.* (1999) 526 U.S. 629, 633, 647–648.)

[2]     To preserve privacy, we refer to the accused and accusing students as Doe, and Roe, respectively, and to witnesses by their initials or first name.

a student accused of sexual misconduct faces severe disciplinary sanctions, and the credibility of witnesses (whether the accusing student, other witnesses, or both) is central to the adjudication of the allegation, fundamental fairness requires, at a minimum, that the university provide a mechanism by which the accused may cross–examine those witnesses, directly or indirectly, at a hearing in which the witnesses appear in person or by other means (such as means provided by technology like videoconferencing) before a neutral adjudicator with the power independently to find facts and make credibility assessments. USC's disciplinary review process failed to provide these protections and, as a result, denied Doe a fair hearing. On that basis, we reverse.[3]

## BACKGROUND

I.   *USC's Sexual Misconduct Policy*

USC's Student Conduct Code (SCC)[4], prohibits nonconsensual "sexual misconduct."[5] The SCC prohibits sexual activity if "[t]here is no affirmative,

---

[3]    Because we reverse on this ground, we do not consider Doe's other challenges to the judgment.

[4]    The record contains two (slightly different) versions of pertinent disciplinary provisions of the SCC. We refer to the version contained in the administrative record.

[5]    Sexual misconduct is broadly defined as (1) "Engaging in any unwelcome sexual advance . . . or other unwanted . . . non-consensual sexual conduct"; (2) "Sexual touching, fondling and/or groping, including intentional contact with the intimate parts of another, causing another to touch one's intimate parts, or disrobing or exposure of another without permission[;]" (3) "Attempted intercourse, sexual contact, sexual touching, fondling and/or

3

conscious and voluntary consent, or consent is not freely given." (§ E.2.III.) "Affirmative consent" means a conscious and voluntary agreement to engage in sexual activity. It requires each party "to ensure that he or she has the affirmative consent of the other or others to engage in the sexual activity. Lack of protest or resistance does not mean consent, nor does silence. . . . Affirmative consent must be ongoing throughout a sexual activity and can be revoked at any time. . . . [T]he fact of past sexual relations between [the persons involved], should never by itself be assumed to be an indicator of consent." Finally, it is not a valid excuse that the accused believed the complainant affirmatively consented to the sexual activity if that belief "arose from the . . . recklessness of the accused," or the accused failed to "take reasonable steps, in the circumstances known to the accused at the time, to ascertain whether the complainant affirmatively consented." (§ E.2 III.4.)

II. *Investigations and Discipline in Cases Involving Allegations of Student Sexual Misconduct*

Student sexual misconduct complaints are directed to USC's Title IX Office. If a student chooses to proceed with an investigation, a trained Title IX investigator is assigned to investigate.

1. *Investigation and Adjudication*

The SCC guarantees students a "fair, thorough, neutral and impartial investigation of the incident." Both the student who reports misconduct and the accused student have equal rights throughout the investigation and

---

groping[; and]" (4) "Non-consensual vaginal or anal penetration . . . with a body part (e.g., penis, tongue, finger, hand, etc.) or object, or oral penetration involving mouth to genital contact."

4

appeal process. (§§ 17.03(D), (M).) The burden of proof rests at all times with the reporting party to show, by a preponderance of evidence, a violation of the SCC. (§ 17.04(D).)

At the outset of a Title IX investigation, the accused student is given written notice that a complaint has been filed, specifying the alleged violation and the basis for the charge. (§ 17.03(A).) The investigator meets separately with the reporting student and the accused student, to explain their rights, the investigative and appeals processes, and to identify available resources. (§§ 17.02(B), 17.03(E).) At these meetings each party may present relevant information, including the names of witnesses and video or documentary evidence, and any information a party believes is relevant. (§ 17.02(C).) The parties may read the investigator's summaries of interviews and respond to that information. (§§ 17.03(F), (G).) Each party may bring an advisor to the meetings to serve in a solely supportive role (i.e., the advisor may not speak or disrupt the party's meeting with the investigator). (§ 17.02(F).) The parties may provide the investigator with "supplemental information" up to the point at which the investigator's findings have been made. They may also, upon request, inspect documents and information gathered during the investigation. (§§ 17.02(C), 17.03(F).) The investigator may conduct additional investigation and witness interviews "as appropriate," and review available pertinent evidence. (§ 17.02(D).) No in person hearing is conducted and the accused student has no right to confront his or her accuser. (§ 17.03.) Once the investigation is complete, the Title IX investigator makes findings of fact and concludes, based on a preponderance of evidence, whether the accused student violated the SCC. If so, in consultation with the Title IX Coordinator, the investigator imposes the sanction that he or she deems appropriate. (§§ 17.02(D), 17.06(A).) Sanctions for sexual misconduct range

5

from disciplinary warnings to suspension, expulsion or revocation of a degree. (§§ 17.06(E)(1)–(16).)

2.    *Appeal*

Either party may appeal the result of the Title IX investigation within two weeks of receipt of the investigator's written decision.  (§ 17.07(A),(F), (I).)  Appeals are reviewed by the Student Behavior Appeals Panel (SBAP), an anonymous three-member panel appointed by the Vice Provost for Student Affairs (Vice Provost), trained to hear sexual misconduct cases, at least one member of which is a faculty member.  (§ 17.07(G).)  The SBAP is advised by a non-voting individual trained in USC's procedures and Title IX requirements.  (§ 17.07(I).)  Appeals are decided solely on the basis of documents.  No oral argument is permitted.[6]  (§ 17.07(A), (E).)  The SBAP may exclude from consideration any evidence it deems inadmissible, including character evidence.  (§ 17.07(G).)

On appeal, the SBAP may:  uphold the Title IX investigator's decision; remand for further investigation; reverse specific factual findings which are

---

[6]    The SCC identifies four grounds for appeal:  (1) new evidence has become available which is sufficient to alter the decision and which the appellant was not aware of or could not reasonably have been obtained at the time of the original review; (2) the sanction imposed is grossly disproportionate to the violation found; (3) procedural errors occurred which had a material impact on the fairness of the investigation; and (4) the conclusion and sanction are not supported by the findings, or the findings are not supported by the evidence in light of the whole record.  (§ 17.07(E).) However, the "Appeal Request Cover Sheet" that Doe submitted with his appeal provided only three grounds for appeal.  Two are identical to numbers (1) and (2) above.  The third states:  "That the investigator failed to follow university rules or regulations while reviewing the cited behavior." (§§ 17.07D–1, 17.07D–2 & 17.07D–3.)

6

not supported by the evidence in light of the whole record; reverse the investigator's conclusions regarding policy violations, if not supported by the findings; or increase or decrease a sanction. If new evidence has been submitted which the SBAP determines should be considered, it may return the matter to the investigator for reconsideration in light of that evidence. If the SBAP determines that procedural errors occurred that materially impacted the fairness of the investigation, it may return the matter to the investigator with instructions to remedy the error. (§ 17.07 (K).) The SBAP may not substitute its opinion as to credibility for that of the investigator, nor may it make new factual findings. (§ 17.07(L).) The SBAP may not reweigh evidence and, if the record contains substantial evidence to support a finding of fact, must defer to that finding. The SBAP may not change a sanction unless it is unsupported by the findings or grossly disproportionate to the violation committed. The SBAP may not substitute its judgment for that of the investigator because it disagrees with the investigator's findings or the sanction imposed. (*Ibid*.)

Once the SBAP concludes its review, its recommendation is forwarded to the Vice Provost, who has unfettered discretion to accept or modify that recommendation based on his or her review of the record. The Vice Provost's decision is final. (§ 17.07(H), (M).)

7

III.    *The Factual Background*

1.    *The October 24, 2014 Incident and Roe's Report*[7]

Shortly after midnight on October 24, 2014, Doe, a freshman attending USC on a football scholarship, and Roe, a senior and student athletic trainer, engaged in sexual intercourse in Doe's campus apartment. Doe believed the encounter was consensual. Roe claimed it was not. On November 5,[8] Roe made a report of sexual misconduct to USC's Title IX Office, and met with respondent Kegan Allee, Ph.D., the Title IX investigator assigned to the investigation.

Roe reported that, on the evening of October 23, she had planned to attend a party with her roommates, and had a couple of mixed drinks with a roommate. At 11:30 p.m., after plans to attend the party fell through, Roe sent Doe, an acquaintance, a text asking what he was "up to," and agreed to go to his place to smoke marijuana. She was "tipsy" when she arrived at Doe's place at about midnight, and she and Doe walked to a taco stand.[9] Roe said Doe was "aggressively touchy," i.e., "grabbing [her breasts] from behind [her] or grabbing at [her] crotch" over her shorts while they walked, and she "push[ed] him away."

_____

[7]    Our recitation is drawn from Dr. Allee's Summary Administrative Report (SAR) of her investigation, her notes of interviews with Roe, Doe and witnesses, and documentary and photographic evidence collected during the investigation.

[8]    Unspecified date references are to calendar year 2014.

[9]    Roe and Doe disagree about whether she went briefly into his apartment before they walked to the taco stand.

Roe and Doe returned to his apartment to smoke some weed. Witness D.N., Doe's cousin and roommate, was in the living room with his girlfriend while Roe was at the apartment, although it was dark and D.N. did not believe that Roe saw him. D.N. told Dr. Allee that Roe was "in a good mood" when she and Doe returned to the apartment at about 1:00 a.m. and went into Doe's bedroom.

Roe told Dr. Allee that she went over to Doe's "just to smoke." "[She] was somewhat tipsy and high, so cross–faded. [She] wasn't hammered, but [she] was not sober. [Roe] was at the foot of the bed when [they] were smoking and [Doe] was up by the pillows. After [they] smoked [Doe] got touchy again. It's kind of a blur. [Roe] remember[s] certain details that frighten [her]. At some point [Doe] just pulled down his sweatpants and put [Roe's] hand on his penis. [Roe] pulled [her] hand away. [She] was really confused and disturbed. Then [Doe] grabbed onto [Roe's breast] again and [she] couldn't pull his hand away" because Doe is "a football player, so he's really strong." Roe told Dr. Allee that she "mentally gave up" when she was unable to remove Doe's hand from her breast. Dr. Allee asked if it was "painful," and Roe said she "had some bruising" on her breast.

Roe reported that Doe committed forcible sexual acts, including nonconsensual vaginal penetration with his penis. He ripped off her shorts (but left all her other clothes on). She tried to pull herself away by holding onto the headboard, but Doe pulled her hands down. Roe tried to push against his chest, but could not push him away. Doe pulled Roe's hands down over her head, using one hand to hold them down. Roe told Dr. Allee that "throughout the entire thing it was easier to say 'I can't' because I know I'm not allowed to for job purposes.'" In response, Doe placed his hand "aggressively" over her mouth, "shush[ing]" her, and said, "[n]o one has to

9

know." This frightened Roe because she was not worried about people knowing, but that she did not want to be engaging in this conduct.

Doe flipped Roe over onto her stomach and continued to have sex with her from behind. He pulled her head back by the hair, which "really hurt[]" and caused her to say "Ow." He stuck several fingers in her mouth.[10] It had not hurt when Doe put his hand over her mouth, but it "wasn't gentle." She was unsure whether he did it to keep her quiet. He told her to suck on his fingers or maybe to get them wet. She was gagging because he was hurting her, and then his fingers were in her mouth. Doe pulled out to finish and it looked like he planned to ejaculate on her face or torso. When he let go of her, Roe "freaked out [and] went between his legs, scooting out quickly." Doe ejaculated on the sheets.[11]

Afterwards, Roe quickly put on her shorts, and grabbed her phone from the floor. Doe asked why she had moved, and she said "Because I didn't want it." Doe told her they "should do this again or [she] should come over again soon, and [Roe] left."

---

[10]   Doe disputed Roe's claim that he placed her hand on his penis against her will, or took her hands off the headboard and held them down. He acknowledged putting his hand over her mouth, but said he did it in a non–aggressive manner and because she was "moaning loud," and he did not want to wake up D.N.'s girlfriend, asleep in the living room. Doe acknowledged having put his fingers in Roe's mouth, and said Roe "willingly sucked on them like a penis." He agreed he had pulled Roe's hair during sex, and said she "moan[ed]" pleasurably in response.

[11]   Roe told Dr. Allee that some ejaculate landed on her shirt, which she saved as evidence. Dr. Allee told her to how to preserve the evidence. Roe did not produce the evidence during the investigation.

Roe told Dr. Allee that she was "just repulsed." There had been no kissing or foreplay, and her thong underwear never came off; Doe simply pushed it aside. Doe "never bothered" to use the condom Roe had seen when she first entered his room. Roe believed that "if [the sexual encounter] was consensual, he could have taken the time to pick it up and put it on." She said that Doe had used force: "When he yanked my hair that hurt, but even before I wasn't able to push him off, and I was trying. I remember feeling like I was pushing a boulder. I don't remember some parts because I was laying there in my own head sometimes asking, 'Is this actually happening?' I was very confused."

Roe went to bed when she got home. That afternoon, she called K.J., whom she was dating and told him what had happened the night before.[12] At first, K.J. said it was "rape and [Roe] should report it," but as the conversation went on, he changed his mind, and said her account of the sexual activity "sounded consensual." Roe then called an ex–boyfriend, B.H.[13]

---

[12] Roe did not identify this witness, and there is no indication that Dr. Allee asked her to. Doe subsequently identified him as K.J., a USC student and member of the track and field team. In a witness statement submitted on Doe's behalf during the appeal, K.J. said he "questioned the veracity of whether the incident was non–consensual based on the questions and answers [he] exchange[d] with [Roe] as it seemed to be consensual."

[13] Dr. Allee contacted B.H. as part of her investigation. In response, he sent her an email stating, "My former girlfriend [Roe] called me on October 25 for emotional support, telling me she was the victim of sexual assault. I am sorry that I have nothing further to add to your investigation."

Roe, who was crying and upset, told her roommates, E.C., H.M. and H.D. what had happened with Doe. H.M., took photos of "small little bruises" she saw on Roe's thighs, chest and arm (Roe gave the photos to Dr. Allee). Roe told Dr. Allee her roommates knew she wasn't interested in Doe. E.C. had specifically asked Roe the night before "if she'd hook up with [Doe]." Roe said "no." The roommates teased her before she went over about hooking up with Doe. To prove that she had not, Roe texted H.M. regularly while she was with Doe, until "everything happened and [she] couldn't text anymore." Roe gave screenshots of those texts to Dr. Allee. None of Roe's texts expressed discomfort about the way Doe touched her.

Dr. Allee interviewed all of Roe's roommates. E.C. said Roe "seemed really upset" on the afternoon of October 24. Roe had told her she had gone to hang out at Doe's apartment, and had not planned to hook up. She was "drinking and smoking weed" on the couch, when Doe "got on top of her."[14] Roe's roommates encouraged her to report the sexual assault, but Roe was "concerned about ruining [Doe's] life or getting him kicked off the [football] team."[15]

H.M. said Roe was "rambling" and "really upset" on October 24. She told H.M. that Doe "held her down and against her will." H.M. said, "That's

[14] No one else told Dr. Allee that Roe drank while at Doe's house.

[15] E.C. and Roe were college roommates for three years. A redacted portion of Dr. Allee's summary of notes from her interview with E.C. states that E.C. had asked Roe if she planned to "hook up" with Doe, because Roe had "hooked up with multiple football players," before and been "reprimanded for unprofessional conduct." Roe and other trainers had had to sign a contract agreeing not to "hook up" with football players.

12

called rape.'" Roe had "small little bruises" inside the thigh and on her arm. H.M. and H.D. each told Dr. Allee they would have noticed the bruises on Roe's arm had the bruises been present on October 23. H.M. encouraged Roe to go to the hospital, "but she wasn't ready."

On October 28, Roe went to the Student Health Center to be tested for sexually transmitted diseases. After Roe explained what happened, medical staff contacted the Los Angeles Police Department, who wrote a report. Roe declined to participate in a criminal investigation.

### 2. *Doe Is Informed of Roe's Allegations of Sexual Misconduct and Immediately Subjected to Interim Sanctions*

On November 7, Doe was notified of a report of sexual misconduct made against him regarding an incident at his apartment on October 24. As a result of that incident, Doe was alleged to have violated numerous provisions of the SCC, including prohibitions against sexual misconduct.[16]

---

[16] Specifically, Doe was alleged to have violated sections: 11.32.B (Endangering Others): "Conducting oneself in a manner that endangers the health or safety of other members . . . within the university community." 11.36.A (Physical Harm): "Causing physical harm to any person in the university community." 11.36.B (Apprehension of Harm): "Causing reasonable apprehension of harm to any person in the university community." 11.41 (Illegal Use of Narcotics or Paraphernalia): "Use, possession or dissemination of illegal drugs or drug-related paraphernalia in the university community." 11.51.A (Harassing or Threatening Behavior): "Comments or actions which are individually directed and which are harassing, intimidating or threatening or interfere with work or learning, for the person at which they are directed and for a reasonable person." 11.53.A (Sexual Misconduct 1): "Engaging in any unwelcome sexual advance, request for sexual favors, or other unwanted verbal or non-consensual sexual

13

Doe was instructed to meet with Dr. Allee by November 14, with or without an advisor, and told he could make a written request to review the report against him, provided he gave at least 24 hours advance notice. Also on November 7, respondent Ainsley Carry, Ed.D., USC's Vice Provost, notified Doe that, effective immediately, USC was taking interim action against him because the allegations described conduct that endangered the safety and well being of the USC community. Doe was permitted only to attend classes in which he was enrolled and to use campus dining facilities. He was prohibited from having visitors at his housing assignment, and from attending any USC–sponsored event. Further, Doe, who was attending college on an athletic scholarship, was prohibited from any involvement with the USC football team, except on the practice field and in the locker room; he could not participate in any game.

---

conduct . . . within the university community . . . , when the conduct, has the effect of unreasonably interfering with an individual's academic or work performance or creating an intimidating, hostile or offensive academic, work or student living environment."

11.53.B (Sexual Misconduct 2): "Sexual touching, fondling and/or groping, including intentional contact with the intimate parts of another, causing another to touch one's intimate parts, or disrobing or exposure of another without permission. Intimate parts? [*sic*] may include the breasts, genitals, buttocks, groin, mouth, or any other part of the body that is touched in a sexual manner."

11.53.C (Sexual Misconduct 3): "Attempted intercourse, sexual contact, sexual touching, fondling and/or groping."

11.53.D (Sexual Misconduct 4): "Non-consensual vaginal or anal penetration, however slight, with a body part (e.g., penis, tongue, finger, hand, etc.) or object, or oral penetration involving mouth to genital contact."

3.    *Doe's First Interview with Dr. Allee*

    a.    *The October 9 Incident*

On November 11, Doe met alone with Dr. Allee. When asked if he knew what the meeting was about, Doe said "With [Roe], right?" Doe asked to read Roe's statement, but before doing so began to describe an encounter he had with Roe on October 9. Roe and her friends had approached him on fraternity row, and she invited him to go swimming. Doe had gone with Roe to her apartment while the women changed, because he needed to charge his phone.

At Roe's apartment, Doe went with Roe into her room to charge his phone. He "hugged [Roe] and started kissing her neck and grabbin' on her [as she sat on his lap] and she was grabbin' on [him]." Roe did not tell him to "stop" or move his hands away, so he kissed her neck and touched her inner thighs. Roe left for about 10 minutes, and when she returned, said they were no longer going swimming.

Doe and Roe laid down on her bed. She wore a bikini bottom and a T–shirt. He removed his shirt and pants and started "fingering"[17] Roe for a couple of minutes. Roe was moaning, which made Doe believe he would "get some play." However, when Roe abruptly said she did not feel well, Doe stopped. Roe told Doe he "could stay the night," but he declined and left. Doe had smelled alcohol on Roe's breath on October 9, but she had not "seem[ed]

---

[17]    Dr. Allee did not ask Doe to clarify what he meant by "fingering," which she defined as "digital penetration." In his appeal, Doe denied having digitally penetrated Roe on October 9, and said Dr. Allee misconstrued his words. He also said Roe fondled his penis on that occasion, which made him believe she consented to sexual touching.

faded." Roe sent Doe a text on October 10. She said she had "blacked" out, but had a vague memory of him being at her house, and asked "what happened last night?" In response, Doe said, among other things, that Roe had been "faded" and they "mess[ed] around" in her room, but did not have intercourse or kiss. He said he had left when she started feeling sick. Doe gave Dr. Allee screen shots of his text exchange with Roe.

b. *The October 24 Incident*

With regard to the October 24 encounter, Doe told Dr. Allee that, after the party plans fell through, Roe come over to smoke a blunt. When she arrived, D.N. and his girlfriend were in the living room, so Roe and Doe went into his room. Roe chose not to smoke. Doe smoked a little, then they walked to a taco stand. Doe had been "feelin' [Roe]," as they walked, by which he meant grabbing her breasts and rubbing her thighs. Roe did not push his hands away.

When Doe and Roe returned to Doe's bedroom, they lay down and talked. He removed her clothes until she was "completely naked," then took off his clothes. Doe "[f]inger[ed]" Roe and grabbed her breasts while she fondled his penis. He got on top of Roe, and she said "No, you don't have a condom." Doe stopped the sexual activity to put on a condom. He had placed a condom nearby earlier, believing he would "get hit" that night, since he and Roe had "messed around before." As Doe retrieved the condom Roe remained naked on his bed, with her legs spread. After Doe put on the condom, he and Roe had consensual sex in different positions, including with her on top. Roe seemed to be "enjoying [herself] facially," and was "[l]ip biting, moaning, kissing [his] neck," and scratching his back during the sexual encounter. Doe ejaculated inside Roe while wearing a condom. Afterward, he helped Roe find her clothes, gave her a hug and she left.

16

Dr. Allee invited Doe to read Roe's differing account of the October 24 sexual encounter. He did, and took issue with several points. He disputed that Roe said "no," and said if she had done so he would "get off and leave." The only time she said "no" was because he was not wearing a condom, and she could have left when he stopped to put one on. She did not. Doe denied that Roe had smoked any marijuana at his house, and denied pulling down his pants to place Roe's hand on his penis. He described Roe's report as "crazy!" As for whether he used a condom, after reading Roe's account, Doe said "Oh, that's right. My fault. I did take the condom off. I pulled out and took the condom off, but it wasn't [as Roe described it]." He explained that he tried to ejaculate on her face and have her swallow it, but she moved and told him she did not want him to ejaculate on her face. They laughed about it, and "[she] wasn't scared for her life." According to Doe, "[i]t was a funny thing to us."[18]

Doe said Roe may have held on to the bed frame, but denied taking her hands off of it or holding them down. He said she probably held on during intercourse because his bed slides. He also acknowledged placing a hand over Roe's mouth. He had not done so aggressively, only to say "'be quiet'" because Roe was moaning loudly and he did not want to wake D.N. or his girlfriend, who were asleep in the living room. Doe put his fingers in Roe's

_____

[18] During a second interview on January 22, 2015, Doe explained that, although he first said he had ejaculated inside Roe, he later recalled standing on his bed after taking off the condom and throwing it away, to ejaculate on Roe's face. Later still, after reviewing a statement in which D.N. said he had seen a used condom in Doe's room, Doe explained that he did not know where the condom was thrown when he took it off, but was certain he wore one and that he threw it away.

17

mouth, and she willingly sucked on them. He admitted pulling her hair, using it to hold her and thrust from behind. He did not flip Roe over; she willingly assumed that position. Doe did not remember her complaining of any pain or saying "ow," only moaning and possibly saying "uh."

When asked what Roe said or did to make him believe she wanted to have sex, Doe said, "When I was fingering her she was grabbin' on my [penis]. I thought that was clear." She also told him he wasn't wearing a condom, and was kissing his neck and scratching his back. Doe also emphasized that he felt "like the last time [the two] hung out [they] were past flirting. Past messin' around. Two weeks later she's comin' over at [12:30] in the morning."

Dr. Allee showed Doe a file of additional information she had gathered, which included screen shots of (1) texts between Roe and someone named "Mia." Doe believed these texts confirmed his theory that Roe was afraid she would be fired if it became known that she had engaged in sex with him;[19] (2) texts between Roe and someone named "Julia"; (3) texts between Roe and H.M.; (4) texts between Roe and Doe from October 21-24; (5) texts between Roe and Doe's teammate, S.V.; (6) photographs of the police report; and (7) photographs of bruises on Roe's legs, arm and breast. Dr. Allee asked if there were any witnesses Doe wanted her to talk to. He said "nobody was in the

---

[19]     The SAR does not reflect that Doe raised this theory during his meeting with Dr. Allee on November 11. However, Dr. Allee's notes from that meeting state that, after reading Roe's texts to Mia, Doe expressed his belief that Roe "got scared that she had sex with [Doe] and was going to get fired because [he knew he] didn't force her to have sex." Several lines of redacted material follow this statement in Dr. Allee's notes. Dr. Allee does specifically mention–and reject–this theory in explaining her reasons for finding Roe more credible than Doe.

18

room[,]" but, after asking Dr. Allee for examples of people who might be helpful, indicated that she should talk to Roe's roommates and to D.N. Doe provided Dr. Allee screenshots of his text exchanges with Roe.

4.    *Dr. Allee's Subsequent Meetings With Roe and Doe*

Dr. Allee had a second meeting with Roe (and an advisor) on January 15, 2015 and questioned her about the interaction with Doe on October 9. Roe told her, "I was pretty drunk. I don't fully remember. I was leaving a party at ZBT and I ran into him and his friends on the sidewalk. Collectively we all decided to go swimming. . . . So we all go back to my apartment so the girls could get bathing suits. My memory is pretty blurry. I remember feeling sick and throwing up in my bathroom and we never went swimming." Roe remembered Doe was at her apartment, but knew they "didn't hook up because [she had] confirmed that the next day." Doe told her they "'messed around," which she assumed meant he "was just flirting with [her]." Roe showed Dr. Allee the same text exchange as Doe had shown the investigator.

Dr. Allee told Roe that Doe claimed to have "digitally penetrated [her] that night [October 9]." In reaction to this news, Roe's "chest, throat, and face flushed bright red with splotches of white; her whole body started visibly shaking; she started sobbing," and cried for several minutes. When Roe regained her composure, she told Dr. Allee she "didn't remember any of that." With Roe's consent, Dr. Allee opened a second case against Doe regarding the incident on October 9.[20]

---

[20]    Although the question of Roe's capacity to consent was at issue, Dr. Allee did not ask Roe or anyone to quantify how much alcohol Roe consumed on October 9. The only witnesses Dr. Allee questioned on this point were Doe, who was asked only if Roe had been drinking on October 9, and Roe's roommate, H.D., who provided no details about Roe's state of intoxication.

During the January 15, 2015 meeting, Roe was adamant that Doe had not used a condom on October 24, and said she "wouldn't have . . . had a million tests done if" he had. She denied scratching Doe's back during sex, kissing him, grabbing his penis or being on top of him. She disputed Doe's account that she went inside his apartment before they walked to get food, as well as his claim that she had not smoked any marijuana. She took four or five hits while in Doe's bedroom. Roe denied sucking Doe's fingers. Instead, she claimed he put his hand over her mouth when she said "ow," and she "felt like [she] was gagging." She also denied willingly flipping over. She never wanted to engage in sex in the first place, but Doe was strong and able to turn her over. Roe denied that she made up the sexual assault because she feared she would be fired. She told Dr. Allee that she knew several "trainers [who] have hooked up with athletes and are fine."

On January 22, 2015, Doe (and an advisor) had a second and final meeting with Dr. Allee. Doe was told Roe had initiated a second case against him regarding the incident on October 9, and claimed that she had no "knowledge about that incident because she was drunk." Doe told Dr. Allee that, when they were in Roe's apartment on October 9, Roe was "grabbin' on [his] penis so of course [he] start[ed] fingering her[,]" and "got on top of her." However, when Roe told him she felt unwell, he said "it's cool," got off, kissed her forehead and left.

Regarding the October 24 sexual encounter, Dr. Allee asked how Doe knew Roe wanted him to pull her hair, to which Doe responded, "I didn't. We were in doggy position. I just assumed she'd like it." Similarly, when asked how he knew Roe wanted to swallow his ejaculate or to have him ejaculate on

her face, Doe said, "I didn't, but if she didn't want to she could get out of the way and she did."

Doe reiterated that Roe did not smoke at his apartment. He first said he remembered smoking a blunt before going out for food, later said he did not smoke until he and Roe returned, and ultimately decided he smoked before going for food because he was not "sober" when walking to the taco stand.

5.  *Additional Witnesses*

Around October 28, Roe texted a witness identified only as "Mia," asking what might happen to an athletic trainer who reported a sexual assault perpetrated by a student athlete. Roe described her alleged sexual assault in details consistent with her report to Dr. Allee. Roe told Mia she was "afraid [Doe]'s going to tell someone we hooked up and then it'll get back to the trainers." Although this is not mentioned in the SAR, Roe's text exchange with Mia also indicates that Roe was worried she might be fired, or be unable to attend graduate school, because she might be unable to get letters of recommendation if the incident became known. There is no indication that Dr. Allee tried to identify or contact Mia.

Doe also sent a text to someone identified only as "Julia," a friend of H.M.'s who had gone through a "similar situation." There is no indication that Dr. Allee tried to identify or contact Julia.

A few days later, Roe sent a text to S.V., a football player. She asked how he would "respond if one of [his] teammates raped someone?", and described a series of events similar to those she had described to Mia.[21]

On November 17, Dr. Allee interviewed D.N., who was with his girlfriend in the living room of the Doe's apartment when the sexual activity between Doe and Roe occurred on October 24. D.N. saw Roe and Doe come into the apartment at about 1:00 a.m., and Roe appeared to be in a good mood. D.N. and his girlfriend heard Roe "moaning," which sounded to him like "normal sex sounds," "pleasure" and "[l]ike somebody enjoying it." D.N.'s girlfriend had asked him if this was an "everyday thing." D.N. told Dr. Allee that the sex and moaning went on for "a while" and, at some point he fell asleep. Later, he "woke up to go to the bathroom and heard [Roe and Doe] talking." D.N. did not see Roe leave the apartment.

D.N. was not surprised the next day when Doe said he and Roe had had sex, because Roe had come to the apartment in the middle of the night, and the prior interactions D.N. had witnessed between the two were flirtatious and sexual in nature. Indeed, D.N. had moved his bed into the living room on October 23 because his girlfriend was spending the night and he knew Doe had a girl coming over. D.N.'s girlfriend was still at the apartment the next morning when Doe and D.N. briefly discussed Doe's sexual encounter with Roe. D.N. saw a "nasty" used condom on Doe's desk, and told him to throw it away. The record does not reflect that Dr. Allee asked D.N. to identify his girlfriend, or that she attempted to interview her.

---

[21] On November 6, Dr. Allee had contact with S.V., but the notes from that meeting are incomplete (page 1 of 2 missing), partially redacted and the relevance, if any, of information Dr. Allee obtained from S.V. is unclear.

Dr. Allee had brief telephonic conversations with Roe on February 9 and 10, 2015, to ask Roe "a few last questions." At Dr. Allee's request, Roe emailed photographs of her bathing suits. Dr. Allee contacted all individuals the parties had identified as potential witnesses, but did not attempt to contact anyone who had been mentioned during the investigation but not fully identified.

On February 10, 2015, Dr. Allee permitted the parties to view the most recent information she had gathered during the interviews on a secure portal. The investigation was closed on February 11, 2015.

6. *Findings and Determinations from the Title IX Investigation*

Under the university's Sexual Misconduct Policy, the Title IX investigator alone makes findings of fact and, using a preponderance of the evidence standard, determines whether the SCC has been violated. The investigator's written decision, and the reasons for that decision, are contained in a SAR.

In her SAR, Dr. Allee concluded, based on her investigation and review of all evidence she deemed relevant, and taking into account her determination as to the parties' credibility, that Doe violated the SCC and "more likely than not, engaged in unwanted sexual conduct that ranged from fondling to vaginal penetration." With respect to the October 24 incident, Dr. Allee determined that the parties' conflicting accounts could not be reconciled, and found Roe's account more credible for several reasons.

First, Dr. Allee found that more evidence corroborated Roe's account of the October 24 incident. Statements made by Roe's three roommates were largely consistent with her account, and Roe told her roommates before going to Doe's apartment that she did not intend to have sex with him. Second, Roe lacked any memory of sexual conduct with Doe on October 9, so she could not

23

have known that Doe would assume they would have more sexual contact on October 24.[22] Roe told her roommates the sex was nonconsensual. Two roommates saw bruises on Roe on October 24 that they had not seen and would have noticed the night before. Third, text messages sent by Roe to third-party witnesses corroborated her report to Dr. Allee.

Dr. Allee rejected Doe's theory that Roe was motivated to fabricate a claim of sexual assault because she was worried she would be fired as an athletic trainer if it became known she had consensual sex with a student athlete. Dr. Allee found "nothing" to support this theory, and observed that USC "would not retaliate against a student who had experienced non–consensual sexual acts." Dr. Allee also made the unattributed assertion that "USC Athletic Training has had knowledge of athletic trainers engaging in consensual sexual activity with athletes and trainers [who] were not fired despite their employment contract . . . prohibit[ing] fraternizing with athletes."

Dr. Allee was struck by Roe's demeanor and physical reaction upon hearing about the October 9 incident. That reaction "effectively convinced"

---

[22] In the SAR, Dr. Allee did not mention that, in a series of flirtatious texts between Doe and Roe on October 23, when they were discussing whether to go and what to wear to the party, Doe told Roe, alternatively, that she "should wear nothing and come to [his] house and smoke [a] blunt," should "come over naked," and asked if the "night [would] end[] up being at [his] house." Roe responded, "Hahaha no I'm not going over to your place naked" and said she "[couldn't] guarantee anything." After Doe told Roe "it's late:/ I just wanted u before u left," Roe responded: "You wanted me? Haha:p," to which Doe responded, "badly."

24

Dr. Allee that Roe had not previously known about Doe's claim to have "digitally penetrated" her,[23] and "was in distress upon learning about it."

Dr. Allee found Doe's credibility was diminished because his statements "were inconsistent over time and he several times corrected his statements only after reviewing other statements." For example, Doe's explanations differed regarding when he had smoked, where he ejaculated and what he did with the condom.

Dr. Allee also noted that Doe made assumptions about Roe's sexual consent which were inconsistent with USC's policy. Specifically, when Roe came to his house on October 24, he assumed they would have sex because of what had transpired on October 9.[24] Additionally, Doe "just assumed" Roe would like him to pull her hair. Similarly, he had not asked if Roe wanted him to ejaculate on her face (or to swallow his ejaculate), but proceeded to do so anyway, saying, "if she didn't want to she could get out of the way and she did."

Further, although Doe described behavior that made him believe he had Roe's affirmative consent on October 9 and 24 (e.g., lip biting, moaning,

---

[23] Later, in his appeal, Doe explained that, when he said he and Roe were "messing around" on October 9, he "want[ed] to be clear that [he] never digitally penetrated [Roe] as [Dr. Allee] claim[ed] [he] did. [Dr. Allee] was making assumptions, and never asked for any clarification of [his] wording."

[24] Under the SCC, the accuser's sexual history is not relevant and may not be used as evidence. However, if here is a sexual history between the parties, and respondent claims consent, the parties' sexual history may be relevant to assess the manner of consent. The mere fact of a current or previous sexual relationship, by itself, is insufficient to constitute consent. (§ 17.04(G).)

25

kissing and scratching him on his back), Dr. Allee found Roe more credible, and concluded it more likely than not that the sexual activity on October 24 was "forcible and non–consensual." Dr. Allee found that Doe violated sections 11.36.B, 11.41, and 11.53.A–11.53.D of the SCC, but did not commit the other alleged violations. However, as to the incident on October 9, Dr. Allee found that Doe did not violate the SCC. Although Dr. Allee found "Roe['s] distress upon learning of the sexual activity [on October 9] . . . believable," she also found there was insufficient evidence to indicate that "[Doe] knew or should have known [Roe] lacked the capacity to consent to sexual activities."

Dr. Allee determined that expulsion and an order prohibiting Doe from contact with Roe were appropriate sanctions. The parties were notified of Dr. Allee's findings and conclusions, and their right to appeal.

IV.  *Doe's Appeal*

On April 3, 2015, Doe submitted an appeal from the SAR. The stated grounds for his appeal were that: (1) new evidence had become available which was sufficient to alter the decision and about which Doe was not aware and could not reasonably have obtained at the time of Dr. Allee's original investigation; (2) procedural errors were committed that materially impacted the fairness of the investigation; and (3) the investigator's conclusions and sanctions were not supported by the findings,  and were not supported by the evidence in light of the whole record.

1.  *New Evidence*

Doe submitted or identified several items of "new evidence" in support of his appeal. The first was a signed witness statement from K.J., the USC athlete Roe was dating at the time of the October 24 incident, but had not identified to Dr. Allee. K.J. stated that when Roe told him on the afternoon

26

of October 24 what had happened with an unnamed perpetrator, he "questioned the veracity of whether the incident was non–consensual." K.J. thought the encounter sounded "consensual." Consistent with Doe's theory that Roe had a motive to lie, and potentially corroborating information that Dr. Allee had redacted from E.C.'s witness statement, K.J. represented that a previous sexual encounter between Roe and a USC athlete, was the reason "she [was] no longer doing training for the USC football team." Doe did not specify when he learned K.J.'s identity, or why he was unable to obtain that information during the investigation.

Two items of new evidence related to the bruises on Roe's arm, thighs and breast. First, Doe noted that, in a text exchange on October 28, Roe told S.V. her bruises were "pretty much gone." Doe observed that four days was a surprisingly short amount of time for bruises to heal. Second, Doe submitted an unsigned "Expert Witness Statement" from a registered nurse. The nurse had 18 years of experience, but did not specify whether she had any expertise in sexual assault. The nurse had reviewed the photographs of Roe's bruises, and opined that none was consistent with bruising one would expect to see one day after a forceful sexual assault.

Third, Doe identified L.W. as a witness he could produce. L.W. was the first person, other than D.N., to whom Doe revealed (on October 27) his sexual encounter with Roe on October 24. Doe had not previously identified this witness because he never considered the encounter nonconsensual. L.W. was being belatedly identified because comments made by Roe's witnesses merely regurgitated what Roe told them, and were not investigated fully by Dr. Allee, who accorded them undue weight. In addition, L.W. could reaffirm what K.J. said about Roe having lost her job as a trainer for the football team after having sex with a player.

27

Fourth, Doe claimed that Roe purposefully had not identified two individuals whom she knew (but Doe did not) who saw her walking with Doe to the taco stand on October 23, and whom Roe tried to avoid. Doe maintained that these individuals would have seen him grope Roe, and claimed that Roe chose not to identify them as witnesses because it would have been detrimental to her story.

Finally, although the Title IX investigator had not found the sexual assault allegations as to the October 9 incident substantiated, Doe identified several items of evidence related to that incident to demonstrate that Roe was not credible, and that Dr. Allee had misconstrued his words. First, he claimed to have given Dr. Allee a detailed description of the bathing suit Roe wore on October 9. (This information is not contained in the SAR.) Although Roe purported to have given photos to Dr. Allee of all her bathing suits, Doe had discovered that, in an effort to discredit him, Roe excluded a photo of the suit he had described to Dr. Allee, and that she had worn on October 9. Doe submitted a photograph of a bathing suit bottom he claimed Roe purposefully hid.

Second, Doe explained that, when he said he and Roe were "messing around," he "never digitally penetrated [Roe] as [Dr. Allee] claim[ed] [he] did." Rather, Dr. Allee misconstrued what he said and never asked for clarification.

Third, Doe took aim at Roe's credibility, arguing she was not as incapacitated as she claimed on October 9. That was evident because E.C. came into the bedroom when Roe and Doe were "messing around," and said "I

28

knew it" when she saw Roe and Doe on the bed.[25]  Roe had quickly left the room for about 10 minutes to talk to E.C. (so she had not been "blacked out" the whole time, nor as drunk as she implied).  Due to the press of time, and having "just" received E.C.'s information, Doe had not had sufficient time to contact her to obtain evidence that Roe was "fine" when they spoke on October 9.  Nor had Roe been asleep when Doe left.  After Doe turned Roe on her side, she said "thank you" and invited him to stay.  Doe also provided a statement from D.N., who was with Doe on October 9 when Roe invited them to go swimming.  D.N. said Roe had not seemed "drunk or out of it."

> 2.  *Unfair Hearing and Title IX Investigator's Failure to Conduct a Thorough Investigation*

Doe argued that Dr. Allee was "biased," "determined to substantiate the most serious . . . allegations, [and had] failed to properly investigate the incident and develop the record with respect to the most critical points.  This flaw infected the entire adjudication process."

Doe also argued there were several fundamental problems with the disciplinary procedures themselves.  Given the serious nature of charges

---

[25]  E.C. denied having been present when Doe was at the apartment on October 9.  A substantial portion of Dr. Allee's notes from her interview of E.C. were redacted.  That redacted material (revealed to the SBAP at an unknown time) includes E.C.'s statement regarding Roe's sexual history with multiple football players.  E.C. said that, following some "inappropriate behaviors" between student trainers and football players, the student trainers had received a group text and been or "were told" that a trainer had "a list and . . . all trainers should come speak to him if they wanted to keep their jobs."  All the trainers signed a contract that they would not "hook up" with players.  Doe requested to see the redacted information, but the SBAP denied his request on the ground that it was irrelevant.

levied against him and the severe consequences he faced if those charges were sustained, his case should have been be decided by an impartial panel, not by Dr. Allee as both sole investigator and decision maker. Doe had been denied any hearing or opportunity to challenge the veracity of any witness against him. Instead, Dr. Allee, who, he argued. acted more like an advocate than an impartial investigator,[26] chose to credit Roe's evidence over his, and failed to conduct a thorough investigation or contact other witnesses in an effort to ferret out the truth. Further, Dr. Allee did not record interviews, but merely took notes which she summarized in the SAR. Doe argued that Dr. Allee chose to redact potentially material information, and mischaracterized things he said, crafting the SAR to reflect "what she thought was said," and, in that process, make Roe's account sound more favorable. In sum, Dr. Allee had inappropriately occupied the roles of "investigator, . . . judge, jury, and executioner in conducting this investigation, assessing guilt or responsibility, and issuing sanctions in a closed [SAR] process." Doe was "given . . . no reasonable opportunity to be heard, and never had an opportunity to examine, confront, or challenge the witnesses against [him]."

Doe also claimed he was denied equal time during the investigation, and lacked sufficient time to interview all the witnesses (particularly one unidentified witness he discovered just days before filing his appeal), or to investigate and rebut evidence against him. In addition, after he produced photographic evidence of the bathing suit he claimed Roe hid to discredit him, Dr. Allee never questioned Roe about that withheld evidence. Instead, Dr.

---

[26]     Doe claimed that he sometimes felt that he was "being attacked" during meetings with Dr. Allee when he tried to question things Roe or her witnesses said.

30

Allee closed the investigation without "giving [Doe] time to respond [to] new [unidentified] evidence . . . sent to the investigator without [his] knowledge."

### 3. *Unfounded Findings, Conclusions and Sanctions*

In support of the third basis for his appeal, Doe argued the investigator failed adequately to explore material contradictions or incongruities in Roe's story, such as, (1) claiming she came to his house solely to smoke marijuana, but had not smoked; (2) concealing the identity of her then–boyfriend from Dr. Allee, because he was a USC athlete; (3) manufacturing text exchanges to make it appear that she had not gone to Doe's house for sex, so she would not lose her job; (4) returning with Doe to his apartment after going for food, despite the fact that he had just engaged in an aggressive, unwelcome public groping of her; and (5) waiting an inordinate amount of time to be tested for STD's, given her claim that Doe wore no condom. Doe also argued that he was given insufficient time to prepare a defense and had limited resources to gather materials to pursue his appeal.

## V. *The SBAP and Dr. Carry Uphold Dr. Allee's Findings; Doe is Expelled and is Not Successful in His Effort to Obtain a Writ of Mandate*

On April 24, 2015, the anonymous SBAP met to review the case file, rejected Doe's contentions, and upheld the sanction of expulsion. The panel affirmed Dr. Allee's findings as to five of six charged SCC violations.[27]

---

[27] As to the remaining count, the SBAP recommended that Doe not be held responsible for attempted nonconsensual intercourse, as it was "not possible to be found responsible for both an attempted act and the completed act."

31

As for Doe's contentions regarding newly discovered evidence, the SBAP agreed with Doe that Dr. Allee should have contacted at least the newly identified witness, and should have followed up with the Athletics Department to ascertain its rules and practices regarding sexual relationships between trainers and athletes. However, the SBAP also found that new evidence identified or produced was, in some instances, irrelevant to the Title IX investigation and, in others, would not have changed the result had it been considered. The panel rejected Doe's assertions that Dr. Allee was biased, and had placed unwarranted emphasis on Roe's statements to witnesses before and after the sexual activity on October 24. In conclusion, the SBAP found no investigatory flaw sufficient to affect the outcome of the investigation, and agreed that expulsion was the appropriate sanction.

On May 12, 2015, four days after receiving the SBAP's recommendations, Dr. Ainsley Carry, the Vice Provost, accepted the SBAP's recommended sanction of expulsion, and Doe was expelled, effective immediately.

Doe filed a petition seeking a writ of administrative mandate against respondents (§ 1094.5). The trial court rejected Doe's contentions that he was denied due process, that Allee or Dr. Carry were biased, and that there was insufficient evidence to support the SAR's findings. The petition was denied. This timely appeal followed entry of judgment.

## DISCUSSION

1.  *A Justiciable Controversy Exists*

Before we consider the merits of Doe's challenges to the judgment, we decide a preliminary issue: whether a justiciable controversy exists. Respondents insist this matter is moot. They allege that, in January 2016,

32

while the writ was pending, Doe was charged with committing several felonies near USC, and, in April 2016, sentenced to six years in state prison, a sentence he was serving when the petition was heard. In August 2016, Doe was expelled for independent violations of the SCC. As a result, respondents argue that, regardless of this Court's decision, Doe is no longer eligible to return to USC. We note that the record does not contain evidence of Doe's conviction, but does show that he was expelled in August 2016.

We agree with the trial court. The matter is not moot: "Being labeled a sex offender by a university has both an immediate and lasting impact on a student's life. [Citation.] . . . . [The student's] personal relationships might suffer. [Citation.] And he could face difficulty obtaining educational and employment opportunities down the road, especially if he is expelled." (*Doe v. Baum* (6th. Cir. 2018) 903 F.3d 575, 582 (*Baum*); *Doe v. University of Cincinnati* (6th Cir. 2017) 872 F.3d 393, 400 [a student's expulsion for a sexual offense can have a lasting impact on his personal life and educational and employment opportunities] (*Cincinnati*).) As the trial court stated, Doe's eligibility to return to USC is not "the only 'effectual relief' that [he] can obtain in this action. . . . [E]xpungment of an expulsion mark for sexual misconduct on [Doe's] USC transcript would make it far easier for him to transfer to a different university to continue his education. Expungement could also have a tendency to restore [Doe's] reputation, at least to some degree, in the public eye."

We proceed to consider Doe's challenges to the judgment.

2.  *The Standard of Review*

"'The remedy of administrative mandamus . . . applies to private organizations that provide for a formal evidentiary hearing.'" (*Doe v. University of Southern California* (2016) 246 Cal.App.4th 221, 237, fn. 9 (*Doe*

33

*v. USC(1)*).)  As relevant here, the question presented by a petition for writ of administrative mandate is whether there was a fair trial.  (§ 1094.5, subd. (b); *Doe v. Regents of University of California (Santa Barbara)* (2018) 28 Cal.App.5th 44, 55 (*UCSB*).)  "We review the fairness of the administrative proceeding de novo[,] . . . 'because the ultimate determination of procedural fairness amounts to a question of law.'  [Citation.]  . . .  '[A] "'fair trial'" means . . . "a fair administrative hearing."'  [Citations.]"  (*Doe v. USC(1)*), *supra,* 246 Cal.App.4th at p. 239; accord, *UCSB, supra*, 28 Cal.App.5th at p. 55; *Doe v. Regents of University of California* (*San Diego*) (2016) 5 Cal.App.5th 1055, 1072 (*UCSD*).)

"The scope of our review from a judgment on a petition for writ of mandate is the same as that of the trial court.  [Citation.]  'An appellate court in a case not involving a fundamental vested right reviews the agency's decision, rather than the trial court's decision, applying the same standard of review applicable in the trial court.'  [Citation.]"  (*Doe v. USC(1), supra,* 246 Cal.App.4th at p. 239.)  This and numerous courts have applied this standard to disciplinary decisions involving sexual misconduct at private and public universities.  (*Ibid*.; *UCSD, supra,* 5 Cal.App.5th at p. 1072; *Doe v. Claremont McKenna College* (2018) 25 Cal.App.5th 1055, 1065 (*CMC*); *UCSB, supra,* 28 Cal.App.5th at p. 56; *Doe v. University of Southern California* (Dec. 11, 2018) ___ Cal.App.5th ___, ___ [2018 WL6499696] (*Doe v. USC(2)*.)

3.    *Doe Has Not Shown that Respondents Harbored Bias Against Him*

Initially, Doe contends that respondents–principally Dr. Allee–were biased against him, resulting in an incomplete and unfair investigation and adjudication.  Doe argues that information gleaned after the disciplinary proceeding revealed that Dr. Allee conducted extensive work as an advocate

34

for victims of sexual assault prior to her employment by USC. According to Doe, that evidence demonstrates that Dr. Allee could not conduct a fair disciplinary investigation and was necessarily biased in favor of alleged victims of sexual assault.[28]

While we understand why Doe believes Dr. Allee might harbor an inherent bias against someone accused of sexual assault, Doe's obligation on appeal is to demonstrate actual bias. A disciplinary decision may not be invalidated solely on the basis of an inference or appearance of bias. (See *Gai v. City of Selma* (1998) 68 Cal.App.4th 213, 219; cf., *BreakZone Billiards v. City of Torrance* (2000) 81 Cal.App.4th 1205, 1236 ["A mere suggestion of bias is not sufficient to overcome the presumption of integrity and honesty" in a hearing officer].) We agree with the trial court's analysis: "[t]he fact that, before her employment at USC, Dr. Allee did some work as a victims' advocate, . . . and gave presentations regarding preventing sexual assault, does not establish that Dr. Allee is likely biased against all men . . . accused of sexual assault." Doe has not provided evidence to demonstrate that Dr. Allee's findings and conclusions were premised on actual bias against him or generally against anyone accused of sexual assault, or that there is a high probability of such bias. Doe's "mere belief that [a school official] acted with . . . ulterior motives is insufficient to state a claim for relief." (*Doe v. Univ. of*

---

[28] Prior to her employment at USC, Dr. Allee worked at the University of California, Santa Barbara (UCSB), directing outreach and services for female survivors of interpersonal violence, harassment, and for a Rape Prevention Education Program. She has made presentations on gender-based violence, focused on the rights of alleged victims, and received an award for her service as an "exemplary advocate for survivors of sexual assault."

*Cincinnati* (S.D. Ohio 2016) 173 F.Supp.3d 586, 602, fn. omitted (*Univ. of Cincinnati*).)[29]

4.      *Fair Hearing Requirements*

Although we conclude that Doe failed to prove actual bias in USC's disciplinary process, we conclude on other grounds that USC's process is fundamentally flawed.  As we explain in more detail below, we hold that in a case such as Doe's, in which a student faces serious discipline for alleged sexual misconduct, and the credibility of witnesses is central to the adjudication of the charge, fundamental fairness requires that the university must at least permit cross-examination of adverse witnesses at a hearing in which the witnesses appear in person or by some other means (such as means provided by technology like videoconferencing) before one or more neutral adjudicator(s) with the power independently to judge credibility and find facts.  The factfinder may not be a single individual with the divided and inconsistent roles occupied here by the Title IX investigator in the USC system.

a.      *General Principles of Fundamental Fairness*

Until recently, few cases had attempted to define "fair hearing standards for student discipline at private universities." (*Doe v. USC(1), supra,* 246 Cal.App.4th at p. 245.)  For practical purposes, common law requirements for a fair disciplinary hearing at a private university mirror the

---

[29]      We also reject Doe's assertion that the members of "the anonymous SBAP panel . . . were not impartial adjudicators."  Neither the SBAP itself, nor any individual panel member, is a party to this action.

due process protections at public universities. (*Id.* at pp. 245–247; see *CMC, supra*, 25 Cal.App.5th at p. 1067, fn. 8; accord, *Doe v. USC*(*2*)*, supra*, \_\_\_Cal.App.5th at p. \_\_\_, (2018WL6499696), fn. 25; cf., *Doe v. Trustees of the University of Penn.* (E.D. Pa. (2017) 270 F.Supp.3d 799, 813 [student at private university was not entitled to the same due process protections as student at a state university, but due process protections applied in contract action in which private university agreed to provide a "fundamentally fair" disciplinary process].)[30]

Fair hearing requirements are "flexible" and entail no "rigid procedure." (*Binkley v. City of Long Beach* (1993) 16 Cal.App.4th 1795, 1807; *Pinsker v. Pacific Coast Society of Orthodontists* (1974) 12 Cal.3d 541, 555 (*Pinsker*).) Disciplinary hearings "need not include all the safeguards and formalities of a criminal trial." (*UCSD, supra*, 5 Cal.App.5th at p. 1078.) "'[T]he formal rules of evidence do not apply . . . .' [Citation.]" (*UCSB, supra,* 28 Cal.App.5th at p. 56; *Univ. of Cincinnati, supra,* 173 F.Supp.3d at p. 602 [there is "no prohibition against the use of hearsay evidence in school disciplinary hearings"].) Historically, all that was required for a student

---

[30] We acknowledge that, unlike public universities, which are ""'subject to federal constitutional guarantees,'" [citation] . . . private college[s], generally [are] not subject to the constitutional requirements of procedural due process." (*CMC, supra*, 25 Cal.App.5th at p. 1067, fn. 8.) Nevertheless, "[d]ue process jurisprudence . . . may be 'instructive' in cases determining fair hearing standards for student disciplinary proceedings at private schools." (*Ibid.*, citing *Doe v. USC*(1)*, supra*, 246 Cal.App.4th at p. 245; accord, *Doe v. USC*(*2*)*, supra,* \_\_\_ Cal.App.5th at p. \_\_\_, fn. 25 [2018WL6499696].) We do not, however, necessarily conclude that the requirements for a fair hearing for a private university are identical to state and federal constitutional requirements. (See *CMC,* at p. 1067, fn. 8.) We need not address that question to resolve this appeal.

37

facing discipline was that he or she "be given some kind of notice and afforded some kind of hearing." (*Goss v. Lopez* (1975) 419 U.S. 565, 579 (*Goss*); see *Board of Curators of Univ. of Missouri v. Horowitz* (1978) 435 U.S. 78, 85–86 [*Goss* requires only an informal "give and take" between the student and administrative body that, at least, gives the student an opportunity to place his conduct in what he believes is the proper context].)

Nonetheless, fundamental fairness requires that a disciplinary proceeding afford an accused student "'a full opportunity to present his defenses.'" (*UCSD, supra,* 5 Cal.App.5th at p. 1104; *Pinsker, supra*, 12 Cal.3d at p. 555 [fair hearing requires that accused be given a "meaningful opportunity to be heard in his defense"].) "'[T]o comport with due process,' the university's procedures should "'be tailored, in light of the decision to be made, to 'the capacities and circumstances of those who are to be heard,' [citation] . . . to insure that they are given a meaningful opportunity to present their case.'"" (*UCSD, supra*, 5 Cal.App.5th at p. 1078.)

b.    *Fair Disciplinary Process in Cases Involving Sexual Misconduct, Where Determination Pivots on Witness Credibility*

A spate of recent cases has attempted more clearly to delineate the contours of a "fair hearing" in university disciplinary proceedings involving allegations of sexual misconduct, where the resolution of conflicting accounts turns on witness credibility.[31] These decisions have wrestled with the

---

[31]    Much of this litigation arose in the wake of the so-called 2011 "Dear Colleague Letter," issued by the U.S. Department of Education's Office for Civil Rights (OCR). Among other things, the 2011 Dear Colleague Letter demanded that academic institutions employ procedures to make it easier for victims of sexual assault to prove their claims in disciplinary actions involving sexual misconduct. It also required schools to adopt measures in

inherent quandaries in evaluating university disciplinary proceedings so as to be fair to both the accused and accusing student, without placing unnecessary burdens on academic institutions. Such situations require recognition of significant competing concerns. There is the accused student's interest in "'avoid[ing] unfair or mistaken exclusion from the educational process, with all of its unfortunate consequences. . . . Disciplinarians,

---

response, or risk losing federal funding. (See Russlynn Ali, OCR, U.S. Dept. of Educ., Dear Colleague Letter: Sexual Violence (Apr. 4, 2011), http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf.)

Questions have been raised about whether disciplinary procedures, implemented in response to the 2011 Dear Colleague letter, in cases alleging sexual assault and discrimination, went too far. (See e.g., *Doe v. Brandeis University* (D.C. Mass. 2016) 177 F.Supp.3d 561, 572 (*Brandeis*); *Doe v. Brown University* (D.C.R.I. 2016) 166 F.Supp.3d 177, 181.) "The goal of reducing sexual assault, and providing appropriate discipline for offenders, is certainly laudable. Whether the elimination of basic procedural protections— and the substantially increased risk that innocent students will be punished—is a fair price to achieve that goal is another question altogether." (*Brandeis, supra,* 177 F.Supp.3d at p. 572; see *Doe v. Marymount University* (E.D. Va. 2018) 297 F.Supp.3d 573, 583, fn. 14, citing *Brandeis, supra*, 177 F.Supp.3d at p. 572.)

In September 2017, OCR withdrew the 2011 Dear Colleague Letter. OCR, Dear Colleague Letter (Sept. 22, 2017) https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf> [as of Jan. 3, 2019].) On November 15, 2018, OCR issued proposed regulations modifying the minimum standards for a Title IX investigation of allegations of sexual misconduct. (OCR, Title IX of the Education Amendments of 1972 Notice of Proposed Rulemaking <https://www2.ed.gov/about/offices/list/ocr/docs/title-ix-nprm.pdf> [as of Jan. 3, 2019] (Proposed Regulations).) Under the Proposed Regulations, on track to become final by February 2019, an investigator also may not serve as adjudicator, universities must hold live hearings, and accused students may have an "advisor" cross-examine the accuser and witnesses, either in person or through a technological medium. (Proposed Regulations, § 106.45, subd. (b)(3), (4).)

although proceeding in utmost good faith, frequently act on the reports and advice of others; and the controlling facts and the nature of the conduct under challenge are often disputed. The risk of error is not at all trivial, and it should be guarded against if that may be done without prohibitive cost or interference with the educational process.'" (*Doe v. USC(1), supra,* 246 Cal.App.4th at p. 240; see *UCSD, supra,* 5 Cal.App.5th at p. 1078; *CMC, supra,* 25 Cal.App.5th at p. 1066.) At the same time, it is vital that universities aim to provide safe environments for their students. "Disciplinary proceedings involving sexual misconduct must also account for the well-being of the alleged victim, who often 'live[s], work[s], and stud[ies] on a shared college campus' with the alleged perpetrator. [Citations.]" (*CMC, supra,* 25 Cal.App.5th at p. 1066.)

Further, these concerns must be addressed in light of the nature of a university and the limits of its resources. "'"A formalized hearing process would divert both resources and attention from a university's main calling, that is education. Although a university must treat students fairly, it is not required to convert its classrooms into courtrooms."' [Citation.]" (*CMC, supra,* 25 Cal.App.5th at p. 1066.) To comport with due process and address these concerns, university procedures must be tailored in light of the matters at issue, to ensure that parties have a meaningful opportunity to present their case. (*UCSD, supra,* 5 Cal.App.5th at p. 1078.)

Recent cases have grappled with these concerns in the context of an accused student's right to confront adverse witnesses. In *CMC, supra,* 25 Cal.App.5th 1055, a student at a private college faced suspension after being accused of engaging in nonconsensual sex with another student. He claimed the sex was consensual. Only the two students witnessed the incident. (*CMC, supra,* 25 Cal.App.5th at p. 1070.) The results of an investigation

conducted by an outside investigator were referred to a committee consisting of that investigator and two CMC representatives. The committee was charged with the responsibility to meet in order to evaluate the evidence, and decide by majority vote whether the accused student committed sexual misconduct. (*Id*. at pp. 1062–1063.) CMC's procedures permitted, but did not require, the parties to appear at the meeting to make an oral statement. Each student submitted a written statement to the committee in advance of the hearing, but only the accused student appeared and spoke at the hearing. (*Id*. at p. 1063.) The committee found his accuser more credible. (*Id*. at p. 1064.)

Our colleagues in Division One found that CMC denied the accused student a fair hearing, given the accuser's failure to appear at the hearing to permit the committee to assess her credibility. Fairness required that committee members hear from her directly before choosing to credit her account. (*CMC, supra*, 25 Cal.App.5th at pp. 1072–1073.) The court held "that where . . . [an accused student] was facing potentially severe consequences and the [review] Committee's decision against him turned on believing [his accuser], the Committee's procedures should have included an opportunity for the Committee to assess [the accuser's] credibility by her appearing at the hearing in person or by videoconference or similar technology, and by the Committee's asking her appropriate questions proposed by [the accused] or the Committee itself." (*Id*. at p. 1057.)

In *Cincinnati*, university procedures permitted an accused student to question witnesses indirectly by submitting questions to a factfinding panel at a live hearing. (*Cincinnati, supra*, 872 F.3d at p. 396.) However, the complaining witness chose not to appear, and the accused student had no opportunity to question her, indirectly or otherwise. (*Id*. at p. 397.)

41

Nevertheless, the review panel relied on an investigator's written report to find the accusing student's statement that she had not consented to sex more credible than the accused's, who claimed the sexual encounter was consensual. (*Id.* at pp. 402, 407.) In light of the directly conflicting claims, and an absence of corroborative evidence to either support or refute the allegations, the review panel was forced to choose whom to believe. "[T]he panel resolved this 'problem of credibility' without assessing [the complainant's] credibility. [Citation.]" (*Id.* at p. 402.) Indeed, "it decided [the accused student's] fate without seeing or hearing from [the complainant] at all." (*Ibid.*) That result was not merely "disturbing"; it was "a denial of due process." (*Ibid.*)

In *UCSB,* our colleagues in Division Six similarly found that neither an accused student nor his accuser received a fair hearing in a case that "turned on the [fact finder's] determination of the credibility of the witnesses. Credibility cannot be properly decided until the accused is given the opportunity to adequately respond to the accusation. The lack of due process in the hearing . . . precluded a fair evaluation of the witnesses' credibility." (*UCSB, supra*, 28 Cal.App.5th at p. 61.) "In disciplining college students, the fundamental principles of fairness require, at a minimum, 'giving the accused students notice of the charges and an opportunity to be heard in their own defense.'" (*Id.* at p. 56.)

In *Baum*, two students gave inconsistent accounts as to whether the accusing student had been so drunk she lacked the capacity to consent. (*Baum, supra*, 903 F.3d at pp. 578-579.) An investigator interviewed 23 witnesses: statements from female witnesses corroborated the accuser; those from male witnesses corroborated the accused's account. (*Id.* at p. 579.) The court found there was a "significant risk" that the accused was denied due

process because the ultimate determination turned on credibility, and the university relied on witness statements rather than receiving live testimony from the accuser, the accused or witnesses. (*Id.* at pp. 581–582, 585.)

"'A decision relating to the misconduct of a student requires a factual determination as to whether the conduct took place or not.' [Citation.] 'The accuracy of that determination can be safeguarded by the sorts of procedural protections traditionally imposed under the Due Process Clause.' [Citation.] Few procedures safeguard accuracy better than adversarial questioning. In the case of competing narratives, 'cross–examination has always been considered a most effective way to ascertain truth.' [Citations.] [¶] 'The ability to cross–examine is most critical when the issue is the credibility of the accuser.' [Citation.] Cross–examination takes aim at credibility like no other procedural device. [Citations.] A cross-examiner may 'delve into the witness' story to test the witness' perceptions and memory.' [Citation.] He may 'expose testimonial infirmities such as forgetfulness, confusion, or evasion . . . thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony.' [Citation.] He may 'reveal[] possible biases, prejudices, or ulterior motives' that color the witness's testimony. [Citation.] His strategy may also backfire, provoking the kind of confident response that makes the witness appear more believable to the fact finder than he intended. [Citations.] Whatever the outcome, 'the greatest legal engine ever invented for the discovery of truth' will do what it is meant to: 'permit[] the [fact finder] that is to decide the [litigant]'s fate to observe the demeanor of the witness in making his statement, thus aiding the [fact finder] in assessing his credibility.' [Citation.]'" (*Cincinnati, supra,* 872 F.3d at pp. 401–402.)

We agree with *CMC*, *Cincinnati* and *UCSB,* that, where credibility is central to a university's determination, a student accused of sexual misconduct has a right to cross-examine his accuser, directly or indirectly, so the fact finder can assess the accuser's credibility. (*CMC, supra,* 25 Cal.App.5th at p. 1070; *Cincinnati, supra,* 872 F.3d at p. 401 ["[T]he opportunity to question a witness and observe her demeanor while being questioned can be just as important to the trier of fact as it is to the accused"]; *UCSB, supra,* 28 Cal.App.5th at p. 60.) Recognizing the risk that an accusing witness may suffer trauma if personally confronted by an alleged assailant at a hearing, we observed in *Doe v. USC(1)*, *supra,* 246 Cal.App.4th 221, that mechanisms can readily be fashioned to "provid[e] accused students with the opportunity to hear the evidence being presented against them without subjecting alleged victims to direct cross-examination by the accused." (*Id.* at p. 245, fn. 12.) For instance, the court in *CMC* noted that an accuser could be present "either physically or through videoconference or like technology to enable the finder of fact to assess the complaining witness's credibility in responding to its own questions or those proposed by the accused student." (*CMC, supra,* 25 Cal.App.5th at p. 1070; accord, *UCSD, supra,* 5 Cal.App.4th at pp. 1103–1104.) In *Baum,* the Sixth Circuit agreed, observing that "if the university does not want the accused to cross–examine the accuser under any scenario, then it must allow a representative to do so." (*Baum, supra,* 903 F.3d at p. 583, fn. 3.)

We also agree with *Baum's* holding extending the right of cross-examination to the questioning of witnesses other than the complainant where their credibility is critical to the fact-finder's determination. "[I]f a university is faced with competing narratives about potential misconduct," some form of in–person questioning is required to enable "the fact-finder [to]

44

observe the witness's demeanor under that questioning." (*Baum, supra*, 903 F.3d at pp. 581-582.)

*Doe v. USC(2), supra*, __ Cal.App.5th ___ [2018 WL 6499696] is the most recent addition to this growing body of law.  In *Doe v. USC(2),* our colleagues in Division Seven found a denial of due process in a case involving allegations of sexual misconduct resolved under the same student disciplinary procedure at issue here.  The court found that a USC student accused of sexual assault and rape, and facing expulsion, was denied a fair hearing when, among other things, USC's Title IX investigator failed personally to interview critical witnesses to observe their demeanor and assess credibility.  (*Id*. at pp. *14-16.)  The determination whether expulsion was appropriate turned on the credibility of several inconsistent witness accounts, and the investigator bore responsibility to determine credibility.  (*Ibid*.)  The court held that the investigator could not make a credibility determination based on a cold record, i.e., written witness statements prepared by a different investigator who had actually conducted the witness interviews.  (*Id*. at pp. *13-14.)

The court reversed and remanded the matter to permit USC to conduct a new disciplinary hearing.  In the event the university chose to reopen the investigation, it was instructed that providing the "accused student . . . the opportunity indirectly to question the complainant" would be part of the investigator's obligation to assess credibility.  (*Id*. at p. *17.)  Although USC's procedures do not provide an accused student the right to submit questions to be asked of the complainant, the court required that the university do so. The court specifically declined to reach the question whether USC's failure to provide a procedure to permit an accused student indirectly to question witnesses against him violated his right to a fair hearing.  (*Id*. at p. *17, fn.

36.) In the course of its discussion, the court observed in a footnote: "Although the Title IX investigator held dual roles as the investigator and adjudicator, 'the combination of investigative and adjudicative functions does not, without more, constitute a due process violation . . . .' [Citations.]" (*Id.* at pp. *35-36, fn. 29.)

In our view, the analysis in *USC v. Doe(2)* did not fully consider a key question: whether the right to a fair hearing, and in particular the right to cross–examination, has any practical efficacy without structural procedural changes in a procedure such as that used by USC. It is true that an administrative procedure in which a single individual or body investigates and adjudicates does not, "without more," violate due process. In *Doe v. USC*(1)*, supra*, 246 Cal.App.4th 221, we recognized "'the value of cross-examination as a means of uncovering the truth [citation], [but] reject[ed] the notion that as a matter of law every administrative appeal . . . must afford the [accused] an opportunity to confront and cross-examine witnesses.'" (*Id.* at p. 245.) We adhere to that view. However, as we also observed, the "'[s]pecific requirements for procedural due process vary depending upon the situation under consideration and the interests involved.' [Citation.]" (*Id.* at p. 244.) When credibility of witnesses is essential to a finding of sexual misconduct, the stakes at issue in the adjudication are high, the interests are significant, and the accused's opportunity to confront adverse witnesses in the face of competing narratives is key. "Cross-examination takes aim at credibility like no other procedural device." (*Cincinnati, supra*, 872 F.3d at p. 401.) Under such circumstances, the performance of this key function is simply too important to entrust to the Title IX investigator in USC's procedure.

As we have explained, in USC's system, no in–person hearing is ever held, nor is one required. Instead, the Title IX investigator interviews witnesses, gathers other evidence, and prepares a written report in which the investigator acts as prosecutor and tribunal, making factual findings, deciding credibility, and imposing discipline. The notion that a single individual, acting in these overlapping and conflicting capacities, is capable of effectively implementing an accused student's right of cross–examination by posing prepared questions to witnesses in the course of the investigation ignores the fundamental nature of cross–examination: adversarial questioning at an in–person hearing at which a neutral fact finder can observe and assess the witness' credibility. (See *Baum, supra*, 903 F.3d at p. 586 ["'Few procedures safeguard accuracy better than adversarial questioning'" through cross-examination]; cf., *Whitford v. Boglino* (7th Cir. 1995) 63 F.3d 527, 534 [due process forbids an officer who was substantially involved in the investigation of charges against an inmate from also serving on the adjudicating committee].) At bottom, assessing what is necessary to conduct meaningful cross–examination depends on a common sense evaluation of the procedure at issue in the context of the decision to be made. From that prospective, a right of "cross–examination" implemented by a single individual acting as investigator, prosecutor, factfinder and sentencer, is incompatible with adversarial questioning designed to uncover the truth. It is simply an extension of the investigation and prosecution itself.[32]

_____

[32] In noting that combining the roles of investigator and adjudicator does not without more violate due process, the court in *USC v. Doe(2)* cited several cases, none of which are inconsistent with our conclusion that USC's system is fundamentally unfair because the Title IX investigator is incapable of effectively implementing the accused's student's right to cross-examine

47

Moreover, the harm to fundamental fairness created by USC's system is amplified by the limited review of the investigator's factual findings available in the university's appellate process.  As we have explained, the SBAP's review relies wholly on the SAR, plus any additional written materials accepted on appeal, and is limited to review for substantial evidence.  The SBAP may not substitute its credibility findings for those made by the investigator, and may not make new factual findings.  Because a version of events provided by a single witness (assuming it is not implausible on its face) constitutes substantial evidence, the mere fact that the complainant's allegations of misconduct are deemed credible by the investigator constitutes substantial evidence.  Thus, the SBAP will virtually never be in a position to set aside an investigator's factual findings.

witnesses.  *Southern Cal. Underground Contractors, Inc. v. City of San Diego* (2003) 108 Cal.App.4th 533, 548-549 stands for the proposition that a party must show actual bias on the part of a decisionmaker, not merely the appearance of bias, to establish a denial of due process.  (*Id.* at pp. 548–549.)

In *Withrow v. Larkin* (1975) 421 U.S. 35, the Court observed that a licensing board's initial determination of probable cause, and its ultimate adjudication rested on different bases and had different purposes.  Thus, the fact that the same agency made them and they related to the same issues would not *ordinarily* constitute a procedural due process violation.  (*Id.* at p. 58.)  Similarly, *Griggs v. Board of Trustees* (1964) 61 Cal.2d 93, and *Hongsathavij v. Queen of Angels etc. Medical Center* (1998) 62 Cal.App.4th 1123, agreed that the mere combination of investigative and adjudicative functions in an agency do not necessarily constitute denial of a fair hearing. (*Griggs v. Board of Trustees, supra,* 61 Cal.2d at p. 98; *Hongsathavij v. Queen of Angels etc. Medical Center, supra,* 62 Cal.App.4th at p. 1142.)  However, as the Court cautioned in *Withrow v. Larkin,* a substantial due process question is clearly raised "if the initial view of the facts based on the evidence derived from nonadversarial processes . . . foreclosed fair and effective consideration at a subsequent adversary hearing leading to ultimate decision."  (*Withrow v. Larkin, supra,* 421 U.S. at p. 58.)

48

Moreover, because the SBAP cannot modify a sanction imposed by the investigator unless it is unsupported by the investigator's factual findings or is grossly disproportionate to the violation shown by those findings, the sanction imposed by the investigator will rarely, if ever, be modified.

In light of these concerns, we hold that when a student accused of sexual misconduct faces severe disciplinary sanctions, and the credibility of witnesses (whether the accusing student, other witnesses, or both) is central to the adjudication of the allegation, fundamental fairness requires, at a minimum, that the university provide a mechanism by which the accused may cross–examine those witnesses, directly or indirectly, at a hearing in which the witnesses appear in person or by other means (e.g., videoconferencing) before a neutral adjudicator with the power independently to find facts and make credibility assessments. That factfinder cannot be a single individual with the divided and inconsistent roles occupied by the Title IX investigator in the USC system.

5.  *Doe Was Denied a Fair Hearing*

The flaws in Dr. Allee's investigation, which formed the basis of her factual findings, illustrate well the significant dangers created by USC's system. This case turned on witness credibility. There are inconsistent accounts from Roe and Doe about whether their sexual encounter was consensual. The only physical evidence is photographs of small bruises on Roe' arms, breast and thigh. That evidence could support either Doe's claim of vigorous consensual sex, or Roe's charge of sexual assault. Evaluation of the credibility of the only witnesses to the event was pivotal to a fair adjudication.

Dr. Allee had unfettered discretion to chart the course and scope of her investigation and to determine credibility, and exercised that discretion in questionable ways. In his first meeting with Dr. Allee, Doe articulated his theory that Roe had a strong motive to fabricate a charge of rape. Dr. Allee seems to have rejected that theory almost immediately, despite investigative leads–such as statements by E.C. and K.J., and Roe's texts to Mia–that, if pursued, would lend support to Doe's theory, and weaken Roe's credibility. This was symptomatic of a larger problem with Dr. Allee's investigation. She did not follow up with presumably identifiable and available witnesses (such as D.N.'s girlfriend, Mia, K.J. or the women who saw Roe and Doe walking together on October 23), who might have filled in holes in the investigation, thus providing a fuller picture from which to make the all-important credibility determination.

In addition, E.C., Roe's long-term roommate at USC, specifically informed the investigator that Roe had been disciplined for having sex with a football player, had agreed in writing not to do so, and could lose her job if she did so again. Roe herself told Mia she was worried about her job and ability to obtain recommendations for graduate school if her sexual encounter with Doe became known. Inexplicably, Dr. Allee failed to check with the Athletic Department to determine its policies and practices regarding sexual relations between student trainers and athletes, let alone ascertain the existence of the agreement Roe purportedly signed. Instead, Dr. Allee accepted at face value Roe's claim that she knew several "trainers [who had] hooked up with athletes and [were] fine." Dr. Allee also made the unattributed, unequivocal pronouncement that "USC's Athletic Training [Department] has had knowledge of athletic trainers engaging in consensual sexual activity with athletes and trainers [who] were not fired despite their

50

employment contract . . . prohibit[ing] fraternizing with athletes."[33]  Finally, in the SAR, Dr. Allee stated that USC "would not retaliate against a student who had experienced *non-consensual* sexual acts."  (Italics added.)  This, of course, does not address Doe's theory that Roe manufactured the charge against him for fear she would suffer negative consequences if her *consensual* sex acts with a football player became known, and suggests, at a minimum, that Dr. Allee may have been confused.

Deficiencies such as these are virtually unavoidable in USC's system, which places in a single individual the overlapping and inconsistent roles of investigator, prosecutor, factfinder, and sentencer.  While providing a hearing at which the witnesses appear and are cross-examined before a neutral factfinder cannot ensure that such flaws do not occur, such a procedure at least provides an accused student with a fair and meaningful opportunity to confront the adverse witnesses in an attempt to expose weaknesses in the evidence.  In Doe's case, he was accused of sexual misconduct for which he faced serious disciplinary sanctions, and the credibility of witnesses was central to the adjudication of the allegations against him.  In those circumstances, he was entitled to a procedure in which he could cross-examine witnesses, directly or indirectly, at a hearing at which the witnesses appeared in person or by other means before a neutral adjudicator with the power to make finding of credibility and facts.  Because USC failed to provide such a procedure, the adjudication findings that he committed sexual

---

[33]  Although the SBAP specifically questioned Dr. Allee's failure to follow up with the Athletic Department, and observed that she should have contacted at least one of Doe's new witnesses, there remained sufficient (a preponderance of ) evidence to sustain the SAR's findings.

misconduct in violation of the SCC cannot stand.  (*UCSD*, *supra*, 5 Cal.App.5th at p. 1084.)

## DISPOSITION

The judgment is reversed and the matter remanded to the trial court with directions to grant Doe's petition for writ of administrative mandate insofar as it seeks to set aside the findings that he violated USC's student conduct code.  Because Doe is no longer eligible for reinstatement, he is not entitled to that relief.  Doe is awarded his costs on appeal.

**CERTIFIED FOR PUBLICATION**


WILLHITE, Acting P. J.


We concur:



COLLINS, J.



DUNNING, J.*


---

*Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.