Filed 2/13/24  Doe v. Regents of the University of California CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| JOHN DOE,<br><br>    Petitioner and Appellant,<br><br>v.<br><br>THE REGENTS OF THE UNIVERSITY OF CALIFORNIA<br><br>    Respondent. | A164398<br><br>(Alameda County<br>Super. Ct. No. RG20082204) |

In September 2020, John Doe (Doe) was dismissed from the University of California, Berkeley (UCB) for violating its policy against sexual violence and harassment.  He challenged the decision, ultimately filing a petition for a writ of administrative mandate against the Regents of the University of California (Regents).  Doe alleges that he was denied a fair and impartial hearing because UCB utilized a "sole investigator/fact finder model" and failed to provide him with a "neutral adjudicator."  He additionally claims that the UCB investigator failed to perform a fair and thorough investigation by failing to obtain an expert toxicology opinion.  Finally, Doe contends that the findings of the hearing officer were not supported by substantial evidence.

1

The trial court considered and rejected all of these arguments, denying the writ petition. Having conducted our own review of the administrative record, we affirm.

## I. BACKGROUND

On October 18, 2019, UCB's Office for the Prevention of Harassment and Discrimination (Title IX Office) received a complaint from student Jane Roe (Roe) alleging that student Doe had sexually assaulted her at her off-campus apartment on August 20, 2019.[1] Pursuant to Title IX and the USB Policy on Student Conduct and Discipline (Student Conduct Code), the Title IX Office commenced an investigation.

### A. *UCB Policies and Procedures Related to Discipline in Cases Involving Sexual Violence or Sexual Harassment*

UCB adopted the Student Conduct Code which incorporates several Appendices. The Student Conduct Code outlines prohibited conduct, resources for students, procedures by which a misconduct allegation is investigated and adjudicated, and possible sanctions. Appendix E is incorporated into the Student Conduct Code and reflects a system-wide policy adopted by the Regents to address allegations of sexual violence and harassment on all University of California campuses.

UCB's Title IX Office is responsible for receiving and responding to complaints regarding sexual violence or sexual harassment. The receipt of a complaint can trigger an investigation, overseen by the Title IX Officer, in

---

[1] Title IX of the federal Education Amendments of 1972 (20 U.S.C. § 1681 et seq. (Title IX)) prohibits sex discrimination under any education program or activity receiving federal funds. Title IX has been applied to require universities to investigate allegations of sexual misconduct involving students. (*Doe v. Regents of University of California* (2022) 80 Cal.App.5th 282, 286.)

which an investigator is designated and charged with conducting "a fair, thorough, and impartial investigation." If a formal investigation of a complaint will be conducted, notice of the charges is sent to the complainant and respondent. The notice includes information about the charges, describes a five-stage investigative and adjudicative process, and advises the parties about their rights and available support resources. Included with the notice is information regarding the ability of the complainant and respondent to submit questions for the investigator to ask witnesses or the other party. The notice also advises that any investigative findings will be based upon the preponderance of evidence and describes the type of evidence that is considered by the investigator. Upon completion of the preliminary investigation and findings, the complainant and respondent are each given a copy of the Report of Investigation (ROI) and provided further opportunity to respond before the ROI is finalized.

Where the investigation results in a recommendation of suspension or dismissal, as was the case here, a hearing to contest the preliminary investigation is automatically triggered. A separate and "appropriately trained" hearing officer is designated, who may be either a university employee or an outside contractor. The hearing officer and a hearing coordinator (who manages the procedural and administrative aspects of the hearing) conduct separate pre-hearing meetings with each party to discuss the hearing process and address questions. Formal rules of evidence and procedure do not apply to the hearing, and evidence will be received if the hearing officer considers it to be relevant and reliable. Under the policies, the investigative file is admitted into evidence at the hearing. In determining whether a policy violation has occurred by a preponderance of the evidence, the hearing officer considers the investigative file as well as any

3

evidence received at the hearing. The hearing officer's findings are then forwarded to the Title IX Office and to Student Conduct for a determination as to the appropriate sanctions to be imposed. The complainant and respondent will receive notice of the determination and any sanction, as well as information regarding the right to appeal. An appeal is limited to three grounds: whether there was procedural error in the hearing that materially affected the outcome; whether the determination regarding policy violation was unreasonable based on the evidence before the hearing officer; and/or whether the sanctions were disproportionate to the hearing officer's findings.

The decision on appeal is final.

## B. *The Incident on August 20, 2019*

Doe and Roe knew each other as they had the same major and mutual friends, including Roe's ex-boyfriend. On the evening of August 20, 2019, Doe and Roe met for dinner. After dinner, they talked about going to a café or pub, but ultimately returned to Roe's apartment. Roe's roommate was not home. Roe's bedroom was the living room, with her bed located in the corner near a wall.

Doe and Roe agree that they both had some alcoholic drinks. Doe drank between four to five glasses of whiskey, while Roe drank one to three beers. Doe and Roe also agree that, at a later point, Doe placed his penis in Roe's vagina. Roe contends that she did not consent; Doe contends she did.

According to Roe, she is a " 'lightweight' " and, after drinking the beer, she felt intoxicated. She asked Doe when he was leaving and initially told him to leave at 10 p.m. but later told him by 11 p.m. She was wearing a dress and put on pajama bottoms under her dress. Due to her intoxication, she fell while trying to put on her pajama pants, and stumbled while walking, knocking over a shoe rack. Roe says that Doe remained in her apartment

4

while she laid down on the floor and fell asleep. At one point, she woke up and saw Doe lying on her bed. Doe suggested she join him on the bed to sleep and stated that he was going home soon. As Doe was friends with Roe and they had spent over 24 hours together in the past, she did not feel uncomfortable. Doe woke Roe up later to suggest they watch a movie, and she was able to get her laptop and unlock it after several attempts. Roe recalled falling back to sleep but woke up to find Doe touching her breasts over her clothes. She felt Doe put his hand in her underwear and touch her genitals. Roe recalls pushing Doe away and moving her body against the wall to stay away from Doe but feeling too intoxicated to stop it. She shook her body and frowned and made a sound like " 'nnng.' " Roe recalled Doe turned her body to face his, suddenly took her pants off and penetrated her vagina with his penis. Roe reported there was no foreplay or kissing and that it happened "really, really fast in a short amount of time" and without all of her clothes being taken off. Roe recalled that as she failed to cooperate, Doe moved her body to try to penetrate her from a different position.

Doe recalls the night differently. Doe had seen Roe far more intoxicated than she was that night. Doe acknowledged Roe was " 'midways' drunk" or "tipsy" but that she was communicative and responsive. Doe never saw Roe pass out or become unconscious, and stated she walked normally and maintained a conversation. Doe acknowledged that, at some point, he and Roe laid down on her bed together. According to Doe, he asked Roe if she wanted to watch a movie, she agreed, and together they laid on the bed and watched YouTube. Doe noticed Roe was not watching the laptop but looking at her phone. After five minutes, Doe asked Roe if she wanted to take her pants off, and she responded by removing her pants and underwear as did Doe. Doe observed the removal of clothing "happened naturally." Doe and

5

Roe mutually touched each other's bodies, kissed each other's cheeks or necks, and ultimately Doe got on top of Roe and had sex while Roe wrapped her arms around his back. Doe agreed that he and Roe did not kiss each other on the mouth. As additional evidence of consent, Doe told the investigator that he touched Roe's vagina and found it lubricated. Doe described Roe as initially participatory, that she verbally responded "yes" to indicate consent and maintained eye contact. Doe acknowledged that after 15 minutes, Roe did not seem to be enjoying sex, and when Doe asked " '[d]o you want this to stop,' " she said yes. Doe maintained that he ceased all sexual activity with Roe at that point. When Doe asked Roe if she wanted him to go home, she said yes, so Doe put his clothes on and returned to his own apartment.

After the incident, Doe and Roe exchanged numerous phone calls and text messages about what happened. Many of the written communications were considered as evidence. The substance of the communications was Roe's assertion to Doe that she had not consented to engaging in sex with him. Doe's responses largely acknowledged that Roe was unhappy, that Doe was sorry she did not like it, but that they had " 'both wanted it.' " Roe demanded that Doe secure the Plan B pill for her, which he did. Shortly after, Doe came with Roe's ex-boyfriend to pick up the ex-boyfriend's belongings at Roe's house. He took a picture of himself doing so and posted it to his social media.

On August 29, 2019, Roe filed a police report with the Berkeley Police Department. No criminal charges were filed. Later, Roe asked Doe to drop a class they were both in and he refused. Doe eventually submitted a written request to the university explaining the conflict with Roe and requesting to drop the class after the drop date. Two months after the incident, Roe filed her complaint with the Title IX Office.

## C.    *The Investigation and Recommendation for Dismissal*

Following receipt of Roe's complaint, a formal investigation was initiated by the Title IX Office.  Attorney Emily Suran was designated as the Complaint Resolution Officer responsible for the investigation.  Suran interviewed Roe, Doe and four non-percipient witnesses and obtained documentary evidence including written statements and texts and electronic messages exchanged between Doe and Roe after the incident.  After gathering these materials, Suran provided Doe and Roe with an opportunity to review the evidence and submit additional comments.

Suran substantiated Roe's complaint, concluding by a preponderance of evidence that she found Roe's version of the events more credible and consistent than Doe's.  Suran determined that Roe was incapacitated and did not consent to sexual contact by Doe and that Doe deliberately took advantage of her incapacity.  Specifically, she found credible Roe's "account of being intermittently asleep and unable to effectively communicate due to her intoxication."  Suran additionally found that Doe's unwelcome sexual contact interfered with Roe's education by creating a hostile environment and thus constituted sexual harassment under Appendix E.  Doe's conduct also violated the Student Conduct Code.  Suran issued her ROI on March 16, 2020, setting forth the complaint; describing the procedures used to investigate the complaint; summarizing her interviews with Roe, Doe, and the non-percipient witnesses; and attaching copies of additional exhibits such as written statements, texts, and electronic messages.

Based upon Suran's preliminary findings, Senior Student Conduct Coordinator Rebecca Wallace informed Doe of the intent to dismiss him from UCB, pending hearing or appeal.  Pursuant to the UCB procedures, an automatic appeal was triggered.

7

## D.    *The Administrative Hearing and Appeal*

The matter was assigned to hearing officer Lauren Becker, an attorney from an outside law firm who was hired by UCB.  Doe objected to Becker's appointment on the basis that she was of a different gender and had externed for a judge that Doe had read negative things about.  The request to disqualify was denied by Student Conduct.

A two-day fact-finding hearing was conducted on July 16 and 17, 2020.  Roe, Doe, and three non-percipient witnesses testified.  Doe's video feed was disconnected while Roe testified, but he listened to her and her interpreted testimony telephonically.  The parties and the hearing officer were otherwise able to see and hear all witnesses.  Roe testified and was questioned by the hearing officer.  Doe was informed of his ability to question Roe by submitting questions to the hearing officer, but he did not do so.

In a written decision, Hearing Officer Becker sustained the complaint against Doe, finding he had violated UCB policy by engaging in sexual acts with Roe without her consent and while she was incapacitated by sleep and alcohol.  Since Doe contested the preliminary determinations in the ROI, Becker did not rely upon or consider those determinations during the hearing.  Rather, Becker found Doe's account to be inconsistent with documentary evidence, including his texts and electronic messages.  In contrast, Becker found Roe's account that the sexual contact was not consensual to be more credible, specifically noting that Roe "credibly described herself as intermittently asleep and 'blacked out' due to alcohol throughout the encounter."  For example, there were aspects of the encounter Roe did not recall, such as Doe inserting his finger in her vagina.

Based upon the hearing officer's findings, the Title IX Office notified Doe he was dismissed from UCB.  Doe appealed, alleging that the decision

8

was not supported by the evidence and submitting detailed arguments disputing evidence and findings made by the hearing officer. Vice Chancellor Catherine Koshland denied his appeal, concluding that Doe had not described any procedural error and that the hearing officer's determination was reasonable based on the evidence presented and credibility findings made.

Doe was dismissed effective September 22, 2020.

## E.    *The Writ Petition and Trial Court's Decision*

On December 8, 2020, Doe filed a petition for writ of mandamus challenging his dismissal. With the filing of his opening brief, Doe requested that the trial court take judicial notice of a toxicologist's report containing opinions regarding blood alcohol content of a female based upon weight and number of drinks that had not been presented during the administrative hearing. Doe argued that the proceeding was not fair because of the absence of a neutral factfinder and that the hearing officer's findings were unsupported by substantial evidence.

The trial court denied the request for judicial notice and denied the writ petition, noting in particular that other witnesses had corroborated Roe's statements regarding her low alcohol tolerance. This appeal followed.

## II.  DISCUSSION

## A.    *Standard of Review*

A student may challenge a disciplinary sanction of suspension or expulsion at a public university by way of a petition for writ of administrative mandate. (*Doe v. Regents of University of California* (2021) 70 Cal.App.5th 521, 532 (*UCSB*)). The student seeking a writ of administrative mandate must show that the institution: (1) acted without, or in excess of, its jurisdiction; (2) deprived the student of a fair administrative hearing; or (3) committed a prejudicial abuse of discretion. (Code Civ. Proc., § 1094.5,

9

subd. (b).)  Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence. (*Ibid.*; *Doe v. Regents of University of California* (2016) 5 Cal.App.5th 1055, 1072 (*UCSD*).)  We review the fairness of the administrative hearing de novo. (*UCSD,* at p. 1072.)  Because student discipline does not involve a fundamental vested right, we review the substantive decision for substantial evidence in light of the whole record.  (*Id.*, at p. 1073.)

## B.      *Doe Was Not Denied a Fair Hearing*

Code of Civil Procedure section 1094.5 subdivision (b) requires that there must have been " ' "a fair administrative hearing." ' "  (*Doe v. University of Southern California* (2016) 246 Cal.App.4th 221, 239, citing *Gonzalez v. Santa Clara County Dept. of Social Services* (2014) 223 Cal.App.4th 72, 96.) In disciplining college students, the fundamental principles of fairness require, at a minimum, " 'giving the accused students notice of the charges and an opportunity to be heard in their own defense.' "  (*Doe v. Regents of University of California* (2018) 28 Cal.App.5th 44, 56, citing *Goss v. Lopez* (1975) 419 U.S. 565, 581.)  Additionally, "[w]here student discipline is at issue, the university must comply with its own policies and procedures." (*UCSD, supra*, 5 Cal.App.5th at p. 1073.)

### 1.      *Doe's Claim He Did Not Have a Neutral Factfinder Is Not Supported by the Record*

Doe contends that he was denied a fair hearing because the investigator's report and findings were submitted into evidence and heavily relied upon by the hearing officer.  He alleges that "[t]he sheer volume of duplicative findings and credibility determinations between the investigator and Hearing Officer decisions [sic] tends to show that Hearing Officer Lauren Becker did not make her own findings and credibility determinations, and

instead simply adopted those of the investigator." Relying on *Doe v. Allee* (2019) 30 Cal.App.5th 1036 (*Allee*), Doe contends that the hearing was unfair because it "implemented a single individual acting as investigator, prosecutor, fact finder and sentencer." (*Id.* at p. 1068.) We disagree.[2]

Doe misapprehends *Allee*, applicable law, and the record in these proceedings. Even *Allee*, which involved a private university, acknowledged "that an administrative procedure in which a single individual or body investigates and adjudicates does not, 'without more,' violate due process." (*Allee, supra,* 30 Cal.App.5th at p. 1067.)[3] Moreover, the United States Supreme Court rejected a due process challenge to the combination of investigatory and adjudicatory functions in a single agency in *Withrow v. Larkin* (1975) 421 U.S. 35 (*Withrow*), finding that a medical licensing board possessing both investigatory and adjudicatory functions did not violate due process. (*Id.* at pp. 52–55.) Relying on *Withrow*, the California Supreme Court likewise concluded that the combination of investigative, prosecutorial,

---

[2] We note that, under UCB's procedures, Doe had the opportunity to appeal the hearing officer's determination on the basis that a procedural error during the hearing process materially affected the outcome. Doe's appeal did not assert procedural error. Arguably, he has therefore forfeited this procedural challenge. (*UCSB, supra,* 70 Cal.App.5th at p. 539.) However, since the facts of the matter are not in dispute, we exercise our discretion to consider this constitutional claim. (*Doe v. University of Southern California* (2018) 29 Cal.App.5th 1212, 1230.)

[3] Recently, our Supreme Court reiterated that "fair procedure" in the context of a private university requires only " 'adequate notice of the "charges" and a reasonable opportunity to respond' " and is not identical to due process. (*Boermeester v. Carry* (2023) 15 Cal.5th 72, 87, 90.) It disapproved *Allee* to the extent it held that a private university must allow an accused student to indirectly cross-examine witnesses at a hearing, even where the university's policies do not provide for such a hearing. (*Id.* at pp. 95–96.)

11

and adjudicatory functions within a single administrative agency does not by itself violate due process. (*Morongo Band of Mission Indians v. State Water Resources Control Board* (2009) 45 Cal.4th 731, 737 (*Morongo Band*).) However, " '[p]rocedural fairness . . . does require some internal separation between advocates and decision makers to preserve neutrality.' " (*Ibid.*) That standard was clearly met here.

Regardless, as a factual matter it simply cannot be said that there was a single investigator and adjudicator in this case. UCB assigned Suran to investigate Roe's complaint. Suran's investigative report and findings were submitted to Senior Conduct Coordinator Wallace who recommended dismissal. Based upon the recommendation, an administrative hearing was automatically triggered. UCB retained a neutral hearing officer, Becker, to hear the administrative hearing. An evidentiary hearing was conducted in which witnesses who were interviewed as part of the investigation also testified. While the ROI was admitted as evidence, hearing officer Becker expressly stated she did not consider Suran's preliminary determinations as they had been contested, instead concluding, based on her own review of all of the evidence, that Doe had violated the university's restrictions against sexual violence and harassment. Based on Becker's findings, the Title IX Office dismissed Doe. Doe's dismissal was appealed to the Chancellor who denied the appeal.

No evidence exists that the investigator or hearing officer colluded or did not act independently. Other than disagreeing with their findings, Doe's only objection to Becker was based on her gender and her association with a judge as an extern. Doe presents no evidence of investigator or hearing officer bias. Absent a financial interest in the outcome, adjudicators are presumed impartial. (*Withrow, supra*, 421 U.S. at p. 47; *Morongo Band,*

12

*supra*, 45 Cal.4th at p. 737.) Doe's argument essentially is that the proceeding was unfair because both the investigator and the hearing officer found Roe credible. None of Doe's arguments show an absence of independent evaluation; rather, they show a consistent view of the same evidence by two independent persons.

### 2.   *A Fair Investigation Did Not Require the Investigator to Obtain an Expert Toxicology Opinion*

Doe also claims that the investigator failed to perform a fair, thorough and impartial investigation as required by Appendix E by failing to secure evidence of the objective chemical effects of drinking one or two cans of beer. In other words, Doe contends that under its policies, UCB had a duty to secure an expert toxicology opinion. Again, we are not persuaded. Appendix E does require UCB to conduct an investigation of allegations of sexual misconduct. But nowhere in the procedures does it require the university to hire an expert witness.

Evidence of intoxication on the evening in dispute was addressed through the testimony of both Doe and Roe. Roe testified to falling asleep, being unable to stand, and knocking over a shoe rack. Doe acknowledged that Roe was under the influence but felt that " 'she seemed OK drunk.' " Other witnesses reported their experiences with Roe being a "lightweight" when drinking alcohol.

Discrepancy exists as to how much beer Roe drank with evidence ranging from one to three beers. However, lay opinion evidence of intoxication is routinely admitted in evidentiary proceedings to establish intoxication. (See *People v. Navarette* (2003) 30 Cal.4th 458, 493; *People v. Williams* (1988) 44 Cal.3d 883, 914; see also *People v. Leahy* (1994) 8 Cal.4th 587, 620 [layperson evidence of intoxication admissible as jurors sufficiently

familiar with symptoms of intoxication that they are able to identify them], dis. opn. of Baxter, J.)[4]

While UCB did not have a duty to secure an expert toxicology opinion, the procedures also did not prevent Doe from doing so. From the start of the investigation, Doe was informed about Roe's allegations and given the opportunity to respond to them. He also had the opportunity to present his own evidence and call his own witnesses at the hearing, which could have included providing expert testimony.

## C. *Doe's Dismissal Was Supported by Substantial Evidence*

Doe next contends that the hearing officer's findings were not supported by substantial evidence by arguing that Roe was not credible, that the amount of alcohol that Roe drank could not have rendered her incapacitated, and that the hearing officer did not correctly assess the evidence. By itself, this argument implicitly acknowledges the existence of evidence in the record. The fact that Doe disputes Roe's version of the events, or is critical of her testimony, does not mean substantial evidence does not exist. Cases involving allegations of sexual assault are unique in that they typically "turn on a credibility contest between the accused and the accuser alone, since the act is most often committed in private." (See *People v. Gammage* (1992) 2 Cal.4th 693, 697.)

In reviewing the adjudicative decision of an administrative agency, a reviewing court cannot substitute its own findings and inferences for that of the agency. A reviewing court does not weigh evidence, consider the credibility of witnesses, or resolve conflicts in the evidence or the reasonable

---

[4] Doe's own proffered expert opinion does not show the absence of alcohol in a female's system based upon the hypothetical scenario. The declaration establishes a range of 0.4 to 0.7 BAC based upon assumed facts.

14

inferences that may be drawn from it. (*UCSD, supra,* 5 Cal.App.5th at p. 1073.) "Only if no reasonable person could reach the conclusion reached by the administrative agency, based on the entire record before it, will a court conclude that the agency's findings are not supported by substantial evidence." (*Akella v. Regents of University of California* (2021) 61 Cal.App.5th 801, 814.) Based upon this record, we cannot find that no reasonable person could reach the conclusion reached by the administrative agency.

Specifically, assuming Doe's credibility as we must, the determination that she was intermittently blacked out or asleep during the encounter is supported by substantial evidence in the record, including her own testimony and corroborating evidence as detailed above. The evidence also supports the conclusion that Doe deliberately took advantage of Doe's incapacitation within the meaning of Appendix E. In sum, Doe was provided a procedurally fair hearing, and substantial evidence supports the agency's decision.

## III. DISPOSITION

The judgment of the trial court is affirmed. Each party shall bear their own costs on appeal.

15

GETTY, J.*

WE CONCUR:

HUMES, P. J.

BANKE, J.

A164398

---