Filed 3/6/26

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| JOHN DOE,　　Plaintiff and Appellant,　v.　REGENTS OF THE UNVERSITY OF CALIFORNIA,　　Defendant and Respondent. | A170234　(Alameda County Super. Ct. No. 22CV009542) |

　　Appellant John Doe was a student at the University of California, Berkeley (the University), when in March 2019 three female students filed complaints that in three separate incidents an intoxicated Doe became increasingly violent and forced them to engage in sexual conduct without their consent.  Shortly after those complaints, Doe was placed on an interim suspension.  He was also charged by the district attorney with several felonies, criminal charges that included a preliminary hearing where two of the complainants testified for over two days, including being vigorously cross-examined by Doe's attorney—criminal proceedings that did not conclude until February 2021 in a plea agreement.

　　Meanwhile, in June 2019, Doe received from the University a notice of allegation that began a lengthy proceeding that proceeded step-by-step in accordance with University procedures, culminating in a "Stage Four" investigative hearing, following which the hearing officer filed a 53-page report sustaining the allegations of two of the complainants.  And Doe was

1

expelled from the University. Doe appealed that decision within the University system, which appeal was unsuccessful.

Doe then filed in superior court a petition for writ of mandate, a petition the trial court denied in a comprehensive order that described in detail all that occurred and the applicable law. Doe appeals, making two arguments, that: (1) he was denied due process because he did not have the opportunity to cross-examine the complainants at the "Stage Four" hearing, and (2) he was prejudiced by the delay in the University proceeding. We conclude that neither argument has merit, and we affirm.

## BACKGROUND

### The General Setting

In March 2019, three University students filed complaints against Doe claiming that in three incidents—in November 2017, November 2018, and March 2019—an intoxicated Doe became increasingly violent and hostile with them and forced them to engage in sexual activity without their consent. For consistency with the trial court, we refer to the complainants as Roe 1, Roe 2, and Roe 3.

The complaints would lead to extensive proceedings at the University held in accordance with what was and is referred to as "Appendix E," a document that sets forth the five "stages" involved in the administrative process.[1] We do not understand Doe to assert error in connection with any of

---

[1] Appendix E is formally "PACAOS-Appendix-E: Sexual Violence and Sexual Harassment Student Investigation and Adjudication Framework for Non-Doe-Covered Conduct," and outlines the University's process for resolving reports of sexual violence and sexual harassment when the parties involved are students and the complained-of conduct does not fall under the specific purview of the United States Department of Education's Title IX regulations.

the stages other than his inability to cross-examine the complainants at the "Stage Four" hearing and his overall complaint about the duration of the University proceeding.  Thus, little need be said about the stages other than Stage Four, which we discuss below.  But before we do, we discuss the criminal proceedings brought by the Alameda County District Attorney.

**The Criminal Proceedings**

In May 2019, Doe was arrested by the Berkeley Police Department, and thereafter charged with eight counts of four different felonies in connection with the incidents:  sexual penetration with a foreign object, forcible oral copulation, forcible rape, and sexual battery by restraint. (Alameda County Superior Court Case No. 19-CR-007720).  A preliminary hearing was held in September at which Roe 1 testified over two days (September 11 and 12), and Roe 3 on one (September 16).  Their testimony alone produced a reporter's transcript of some 360 pages, 180 pages of which was cross-examination by Doe's attorney, the same attorney who would come to assist him at the "Stage Four" hearing.  Their testimony included the following.

Roe 1 testified that Doe sexually assaulted her on November 3, 2017, after an off-campus event.  Roe 1 had never met Doe, but they been set up for a "date party," after which they ended up in a room at Doe's house.  Roe 1 was initially willing to "make out" with Doe and engage in limited contact, but Doe became increasingly aggressive, pinning down her wrists and trying to uncover her breasts.  Roe 1 objected, but Doe continued to grab her breasts and kiss and bite her.  Several times Roe 1 told Doe he was hurting her and she did not like it; he nevertheless continued, and told her, "[d]on't be a pussy."

Doe moved her underwear to the side and tried to digitally penetrate her with enough pressure to cause her pain, again ignoring her attempts to

3

stop. He then proceeded to pin her legs back and perform oral sex on her, as she was unable to move away; she again protested, but he did not stop. So, despite not wanting to have sex with him, but feeling Doe would get whatever he wanted regardless of her feelings and wanting the encounter to end faster, Roe 1 told Doe she would have sex with him if he would just stop hurting her. Doe texted his fraternity brothers for a condom, and tried to engage in intercourse but was unable to maintain an erection and only partially penetrated Roe 1. After multiple attempts, he gave up and let Roe 1 leave. Later, Roe 1 noticed she had bruises, bite marks, and swelling on her lips, chest, neck, hips, legs, and vaginal area, and took photographs of her injuries.[2]

Roe 3 testified that Doe assaulted her on March 14, 2019. She and Doe were friends and had gone to a bar with other friends, after which they returned to Doe's house. They were having casual conversation on a large balcony when Doe tried to make a pass at her, backing her into a corner and kissing her, saying he had wanted to engage in sexual activity with her for a long time. Roe 3 protested and pushed him away. Doe said, "I don't care," and continued to corner her and grab her breasts and other parts of her body, hard. When Roe 3 tried to get away, Doe punched her in the left eye and ribs.

---

[2]    Though the incident with Roe 1 occurred in November 2017, she did not make a complaint to the University until March 2019, a fact that Doe discusses in critical terms for several pages in his brief. The record reflects that the University in fact received reports regarding Roe 1 as early as Fall 2017, but she did not respond to the University's Office for the Prevention of Harassment and Discrimination (OPHD), and the matter was preliminarily closed. Some 18 months later, Roe 1 directly contacted OPHD to report the assault by Doe, and later stated that she initially delayed reporting the matter because she was trying to handle the matter herself, but decided to report it after processing what had happened to her and after hearing that Doe may have done something similar to other women.

He then grabbed her hair, shoved her to her knees and forced her to perform oral sex on him. Roe 3 was eventually able to push him aside and run away, crying hysterically. She reported it to the police the next day.

The criminal proceedings ended in February 2021, when Doe entered into a plea agreement.

**The University Proceedings**

As noted, "Appendix E" has a detailed procedure for dealing with claims of sexual assault, setting out the five steps—called "stages"—involved. "Stage One" deals with the University's receipt of a complaint of a potential violation of the Sexual Violence and Sexual Harassment (SVSH) Policy. In "Stage Two," the campus Title IX officer determines whether an investigation should be initiated. If an investigation is warranted, the University provides written notice of the charges to both the complainant and the accused. The campus Title IX officer is required to designate an investigator to "conduct a fair, thorough, and impartial investigation," at the conclusion of which the investigator prepares a written report. If the investigator preliminarily determines that a policy violation took place, the campus Student Conduct Office then reviews the report, meets with the parties to solicit their input, and provides a proposed sanction.

"Stage Three" begins upon issuance of the proposed sanction (or a finding of no SVSH violation) and gives both parties the right to contest the investigator's preliminary determinations, at which point the matter proceeds to "Stage Four," the fact finding hearing.

As also noted, Doe does not attack the University proceedings up to the point of the "Stage Four" hearing, and even as to that fundamentally only as to his inability to cross-examine the Roes. Indeed, Doe himself acknowledges

5

the thoroughness of the University's conduct, describing in his brief what occurred this way:

"The investigation included interviews of [Roe] 1, [Roe] 2, [Roe] 3, John Doe, and 13 student witnesses who were deemed relevant to the case. The interviews were conducted between March 26, 2019, and March 1, 2021. Seven additional witnesses were contacted to participate in the investigation but were unresponsive to OPHD's outreach. Documentary evidence was also collected by the investigators, including photographs, text messages, transcripts from the Preliminary Hearing from the criminal proceedings, and public records. During the investigation, the parties were each given an equal opportunity to review and comment on the evidence gathered."

It was against this background that the hearing occurred.

Liz Paris, an attorney at the Van Dermyden Maddux Law Corporation, was appointed by the University as the hearing officer and, on May 26, 2021, she scheduled the hearing for August 27, when it in fact occurred. Paris heard from Doe and three witnesses, but not any of the Roes. Doe's brief describes for over three pages his description of what occurred at the hearing, with a description that can only be described as skewed completely in Doe's favor, the brief describing the witnesses' testimony as essentially favoring him or as not based on first-hand knowledge or as their being unable to recall.[3] But Doe's brief does describe Doe's full participation at the hearing,

_____

[3] Along these same lines, Doe's "Statement of Facts" begins with "John Doe's interactions with the complainants," which goes on for some four pages describing the interactions with all three Roes in ways skewed in Doe's favor, asserting that Doe "did not have any memorable interactions" with Roe 2, and that his interactions with Roe 1 and Roe 3 were consensual. Incredibly, nowhere in the four pages is there any mention of Doe being intoxicated, despite his fraternity brothers' testimony.

including that he "was present and gave an opening statement." The brief asserts that Doe "disputed the complainants' allegations and testified he did not engage in violence, harassment, or sexual assault of any of the complainants, and that all sexual activity was based on affirmative consent." And, finally, that "Doe presented a closing statement, in which he again disputed the sexual misconduct allegations and also listed some of the questions he would have asked the complainants if they had made themselves available for questioning at the University hearing," adding that "[b]ecause the complainants chose not to testify or participate in the hearing at all, . . . Doe's testimony and arguments were unrebutted."

On September 16, Paris issued a 53-page written decision finding that Doe had violated the 2016 SVSH Policy and the 2016 Student Conduct Code with respect to Roe 1 and Roe 3.[4] Paris did not find sufficient evidence to substantiate the allegations regarding Roe 2.

Paris found Roe 1's testimony to be more credible than Doe's because of the consistency in her statements to investigators, her testimony at the preliminary hearing, and her text messages submitted as part of the evidentiary record. By contrast, Paris concluded that Doe was not credible in his hearing testimony. He had testified that he was not at all impaired by alcohol on the night in question, that he had been very careful not to harm Roe 1, and that he immediately responded to her request to be gentler during the encounter. Paris found his description of the sexual activity with Roe 1

---

[4] At the time frame pertinent here, the University had two written policies that governed conduct that could lead to student discipline: (1) the SVSH Policy, which defined and explained the conduct and behavior that could lead to student discipline; and (2) the 2016 Berkeley Campus Code of Student Conduct (Code of Conduct), which defined and explained additional conduct and behavior that could lead to student discipline.

"implausible" and not supported by the record. Not only had members of Doe's fraternity stated that Doe described himself as "blacked out" on the night of the incident, there was photographic evidence that Roe 1 was left with extensive bruising and abrasions on her face, breasts, and neck. Furthermore, one of the witnesses testified that Roe 1 shared her allegations with the witness just days after the assault.

As for Roe 3, Paris found that without Roe 3's consent, Doe touched her breasts and buttocks, punched her two times, physically prevented her from leaving, and forced her head down to kneel in front of him and orally copulate him. Paris found credibility issues as to both Roe 3 and Doe, finding with respect to the former that a witness testified that the kissing appeared consensual. However, Paris found the timing of Roe 3's allegations—she went to the police the next day—to be significant, along with the fact that Doe's friends had described Roe 3 as extremely upset immediately after the incident. Moreover, Paris noted that Roe 3 was consistent in her statements throughout the proceeding and in her testimony and cross-examination during Doe's criminal case. By contrast, Paris noted that Doe's allegations about the incident did not align with multiple witnesses who were his friends, including with respect to Doe's testimony that he was not intoxicated.[5]

---

[5]     The trial court would later describe the thoroughness of Paris's credibility determination as to Roe 3 this way: "The analysis carefully weighed and compared the credibility of the witnesses: Although Paris concedes Roe 3 had some credibility issues, Paris found Roe 3's testimony from the preliminary hearing more credible than Doe's testimony at the administrative hearing. Paris reasoned: (1) Roe 3 made her allegations immediately after the incident and they remained 'remarkably consistent' ever since, (2) third party witnesses corroborated Roe 3's allegations that after the encounter, she was distraught, (3) Doe's suggestion that Roe 3 made

The University Center for Student Conduct reviewed Paris's conclusions, and on September 22 issued a sanction dismissing Doe from the University for an indefinite period.

On October 5, under "Stage Five", Doe appealed Paris's decision asserting three arguments, the first of which was that "[t]here was procedural error in the hearing process that materially affected the outcome," which "procedural error[s]" were: (1) "[f]inding that the policy violations were substantiated without testimony from [Complainant 1] or [Complainant 3]"; (2) "[h]olding [him] to a more severe credibility standard than the Complainants"; and (3) "[e]xcessive delay resulting in prejudice." Second, Doe argued that "[t]he determination regarding policy violation was unreasonable based on the evidence before the hearing officer." Finally, he argued that "[t]he sanctions were disproportionate to the hearing officer's findings."

The appeal was heard by University Vice-Chancellor Stephen C. Sutton who, by a letter dated November 2, denied the appeal. Doing so, the Vice-Chancellor found that Roe 1 and Roe 3 had given their testimony under oath, that there was no evidence of different credibility standards being applied, and that all extensions resulting in the length of the matter were given for good cause in compliance with Appendix E. The Vice-Chancellor stressed that Roe 1 and Roe 3 provided testimony that was subjected to cross-

---

up the assault 'to have her boyfriend view her in a more favorable light' seemed improbable, given Roe's participation in a 'relatively arduous process . . . including police interviews, District Attorney interviews, and testifying at a preliminary hearing for several hours.' By contrast, details of Doe's testimony were 'not corroborated' by his other witnesses, including his level of intoxication, which likely affected his memory. Thus, the Decision concludes, 'I give greater weight to [Roe] Three's statements, and therefore find that [Doe] engaged in the behavior as alleged. . . .'"

9

examination under oath that was provided to Doe for use in his defense. Finally, the Vice-Chancellor found that dismissal was appropriate based on Doe's substantiated misconduct.

Doe was dismissed from the University.

**Proceedings in the Trial Court**

On April 7, 2022, Doe filed a petition for writ of administrative mandamus (Code Civ. Proc., § 1094.5) and, alternatively, traditional writ relief (Code Civ. Proc., § 1085), naming as respondent the Regents of the University of California (Regents).

On May 27, the Regents filed their answer to the petition.

On July 6, 2023, the case was reassigned to the Honorable Michael Markman, and then reassigned again to the Honorable Jenna Whitman who, on August 22, set the briefing schedule and hearing on the petition.

On September 8, Doe filed his opening brief that made two arguments asserting Doe was denied due process on two bases: (1) Roe 1 and Roe 3 did not testify at the administrative hearing, and (2) the administrative proceeding was delayed.[6] The brief relied heavily on *Doe v. Allee* (2019) 30 Cal.App.5th 1036 (*Allee*), which it cited three times.

The Regents filed opposition, Doe a reply, and the matter came for hearing before Judge Whitman on November 7. At the hearing, Judge Whitman ordered augmentation of the administrative record to include correspondence between the University and Roes 1 and 3 regarding their decisions not to attend the hearing, and supplemental briefing on the issue. The Regents argued in their supplemental brief that, as the Roes expressly put it, the process of participating in an investigation, and then a formal

---

[6] The brief did not address traditional writ relief.

10

hearing, not to mention a criminal proceeding, is difficult and traumatic for sexual assault victims. Doe argued that Roe 1 and Roe 3 simply did not want to be confronted about having fabricated their assaults.

By order of December 26, Judge Whitman denied Doe's petition in a comprehensive, 13-page, single-spaced order. As to Doe's argument based on *Allee* Judge Whitman held—as will be seen, correctly—that "*Allee* is no longer good law to the extent it required cross examination *at the hearing*." As to the requirements of due process, Judge Whitman found that Doe's opportunity to cross-examine Roe 1 and Roe 3 during his criminal proceeding, particularly when combined with his opportunity to cross-examine other witnesses at the administrative hearing, was sufficient. Moreover, she added, the necessity of viewing live testimony is "context specific" and that hearing officer Paris reasonably concluded that the transcript of sworn criminal court testimony was sufficient to assess credibility, particularly when compared to the statements that Roes 1 and 3 made to the investigator and to witnesses. Finally, Judge Whitman rejected Doe's argument regarding delay, finding that no prejudice was shown and the time of the hearing was reasonable.

On January 23, 2024, judgment was entered for the Regents, from which Doe filed a notice of appeal.

## DISCUSSION

### Standard of Review

A university student may challenge a disciplinary sanction by a petition for writ of administrative mandate. (*Doe v. Regents of University of California* (2016) 5 Cal.App.5th 1055, 1058, 1070 (*Regents I*); *Berman v. Regents of University of California* (2014) 229 Cal.App.4th 1265, 1267, 1270 (*Berman*).) In reviewing a judgment on such a writ, we review the agency's

11

decision, rather than the trial court's, applying the same standard of review applicable in the trial court. (*Regents I*, *supra*, at p. 1077.) And such review is limited to "whether the respondent has proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion." (Code Civ. Proc., § 1094.5, subd. (b).)

" 'The statute's requirement of a " 'fair' " trial means that there must have been "a fair administrative hearing." ' [Citation.] Where student discipline is at issue, the university must comply with its own policies and procedures." (*Regents I*, *supra*, 5 Cal.App.5th at p. 1073, citing *Berman*, *supra*, 229 Cal.App.4th at p. 1271.) " ' "A challenge to the procedural fairness of the administrative hearing is reviewed de novo on appeal because the ultimate determination of procedural fairness amounts to a question of law." ' " (*Boermeester v. Carry* (2023) 15 Cal.5th 72, 85 (*Boermeester*).)

### The Legal Landscape

For the last 15 or so years, legislatures, courts, and commentators have been grappling with the issue of cross-examination in university proceedings involving claims of sexual assault of students. As described in *Boermeester*, "This judicial and legislative activity likely began in response to a 'Dear Colleague' letter relating to title IX of the Education Amendments of 1972 (20 U.S.C. § 1681 et seq.) (Title IX) that the OCR [The United States Department of Education Office of Civil Rights] issued in 2011, which gave guidance on the specific procedures federally funded universities should implement when investigating sexual harassment allegations. The letter sought to stymie the rising tide of sexual assault on campuses by making it easier for victims to prove their claims in university disciplinary actions. Though the letter was rescinded in 2017, students accused of sexual misconduct or intimate partner violence continue to challenge many of the disciplinary procedures

12

universities have since implemented, asserting that these procedures create an unfair process which may result in universities mistakenly imposing severe sanctions upon accused students, including expulsion." (*Boermeester*, *supra*, 15 Cal.5th at pp. 78–79.)

Beginning in 2016, a series of cases from the Second Appellate District addressed the issue, the first two holding that cross-examination was not required. (See *Doe v. University of Southern California* (2016) 246 Cal.App.4th 221, 245 [" 'we reject the notion that as a matter of law every administrative appeal . . . must afford the [accused] an opportunity to confront and cross-examine witnesses.' "]; *Regents I, supra*, 5 Cal.App.5th at p. 1086.) Of particular note was this observation in the former case about the uniqueness of the issue of sexual misconduct in the university setting to cause the issue to be handled with sensitivity: "In administrative cases addressing sexual assault involving students who live, work, and study on a shared college campus, cross-examination is especially fraught with potential drawbacks. The United States Department of Education Office for Civil Rights (OCR) addressed this issue in its April 4, 2011 'Dear Colleague' letter, intended as a guidance document regarding sexual violence on college campuses. It stated, 'OCR strongly discourages schools from allowing the parties personally to question or cross-examine each other during the hearing. Allowing an alleged perpetrator to question an alleged victim directly may be traumatic or intimidating, thereby possibly escalating or perpetuating a hostile environment.' (OCR Dear Colleague letter, p. 12.)" (*Doe v. University of Southern California, supra*, 246 Cal.App.4th at p. 245, fns. omitted.)

In 2018 came *Doe v. Claremont McKenna College* (2018) 25 Cal.App.5th 1055, holding that an accused student should have some method of

conducting what the court called "indirect" cross-examination (see *id.* at p. 1071), at the same time not requiring any hearing at all. (*Id.* at pp. 1066, 1071.)

The next year came *Allee*, *supra*, 30 Cal.App.5th 1036, involving a student at the University of Southern California (USC) who was expelled based on a finding that he engaged in nonconsensual sex with another student. The trial court denied his petition for administrative mandate. The Court of Appeal reversed, holding that when a student accused of sexual misconduct faces severe disciplinary sanctions, and the credibility of witnesses—whether the accusing student, other witnesses, or both—is central to the adjudication of the allegation, fundamental fairness requires at a minimum that the university provide a mechanism by which the accused may cross–examine those witnesses, directly or indirectly, at a hearing in which the witnesses appear in person or by other means. (*Id.* at p. 1067.) The court summed up: while "the ' "[s]pecific requirements for procedural due process vary depending upon the situation under consideration and the interests involved[,]" ' " (*ibid.*), where a student is facing " 'severe consequences' " (*id.* at p. 1064) and "credibility is central to a university's determination, a student accused of sexual misconduct has a right to cross-examine his accuser, directly or indirectly, so the fact finder can assess the accuser's credibility." (*Id.* at p. 1066.)

In 2020, the Legislature enacted legislation setting forth the precise procedures it felt were necessary to ensure fairness to both the accused student and the accuser and to combat sexual violence on university campuses. That legislation was Senate Bill No. 493 (2019–2020 Reg. Sess.) (Senate Bill 493), a bill we discuss in some detail below.

14

The issue reached our Supreme Court in 2023, in *Boermeester*, *supra*, 15 Cal.5th 72. Boermeester, also a student at USC, was expelled after a student accused him, her boyfriend, of assaulting her. The accuser later recanted and refused to attend the hearing in the disciplinary proceeding. (*Id.* at p. 84.) Boermeester sought writ relief on the ground he was denied the ability to cross-examine the complainant. The trial court ruled for USC, but a divided Court of Appeal reversed, the majority concluding that " 'USC's disciplinary procedures . . . were unfair because they denied Boermeester a meaningful opportunity to cross-examine critical witnesses at an in-person hearing.' " (*Id.* at p. 89.) The Supreme Court reversed the Court of Appeal.

The question before the Court was whether Boermeester was denied fair procedure, and the Court concluded he was not: "Requiring live hearings featuring real-time cross-examination of witnesses in the accused student's presence would be contrary to our prior conclusion that 'fair procedure does not compel formal proceedings with all the embellishments of a court trial.' [Citation.] It would also be contrary to our admonition that courts must refrain from fixing rigid trial-like procedures 'that must invariably be observed.' " (*Boermeester*, *supra*, 15 Cal.5th at pp. 93–94.)

The Court had a lengthy discussion of Senate Bill 493, though noting that it did not apply there since the incident and USC's investigation predated the Senate Bill's effective date. (*Boermeester*, *supra*, 15 Cal.5th at p. 91.) Despite that, the Court found "it noteworthy that the statute does not require universities to conduct live hearings featuring cross-examination of the accuser and other witnesses" (*id.* at p. 91), going on with this detail:

"Senate Bill 493 is intended 'to account for the significant individual civil consequences faced by respondents alleged to have committed sexual violence as well as the significant harm to individual complainants and to

15

education equity more generally if sexual violence goes unaddressed.' (Stats. 2020, ch. 303, § 1, subd. (n).) As relevant here, it gives universities the discretion to decide whether 'a hearing is necessary to determine whether any sexual violence more likely than not occurred.' (Ed. Code, § 66281.8, subd. (b)(4)(A)(8), added by Stats. 2020, ch. 303, § 3.) It also instructs universities to consider, '[i]n making this decision, . . . whether the parties elected to participate in the investigation and whether each party had the opportunity to suggest questions to be asked of the other party or witnesses, or both, during the investigation.' (*Ibid*.) Thus, universities are left to determine for themselves whether to conduct a hearing, how to format it, and what rules govern it.

"Senate Bill 493 expressly provides that universities need not comply with any of its provisions that conflict with federal law. [Citation.] Federal law in this area is still evolving. After the OCR rescinded its 2011 'Dear Colleague' letter in 2017, it began a rulemaking process culminating in Title IX regulations that went into effect on August 14, 2020, three years after Boermeester's expulsion from USC. Though the 2020 Title IX regulations are inapplicable here, it is worth observing that the Title IX regulations may be trending towards providing private universities with more flexibility in determining whether to conduct a live hearing. . . . After reexamining its position and evaluating relevant case law, the OCR determined that 'neither Title IX nor due process and fundamental fairness' (87 Fed. Reg., at p. 41505 [July 12, 2022]) requires universities 'to provide for a live hearing with advisor-conducted cross-examination in all cases' (*id.* at p. 41507). The OCR further justified the proposed amendments by stating that growing evidence calls into question 'whether adversarial cross-examination is the most effective tool for truth-seeking in the context of sex-based harassment

16

complaints involving students at postsecondary institutions' and shows that 'information-gathering approaches such as questions asked in individual meetings instead of during a live hearing (sometimes described as inquisitorial procedures) are more likely to produce the truth than adversarial methods like cross-examination.' (*Ibid*.)

"As stated above, we find it significant that Senate Bill 493 (as well as the OCR's most recent proposed amendments to the Title IX regulations) give universities wide latitude in determining the precise nature of their disciplinary proceedings." (*Boermeester*, *supra*, 15 Cal.5th at pp. 91–92.)

*Boermeester* also disapproved *Allee*. (*Boermeester*, *supra*, 15 Cal.5th at p. 96.)

**Doe Was Not Denied Due Process**

Doe's primary argument is that he was denied due process because he was denied the opportunity to cross-examine "his accusers at a hearing." The argument asserts that "[l]egal authority is abundantly clear that in a quasi-judicial administrative proceeding where an administrative board or hearing officer 'makes a decision based on a party's testimony, the adversary is entitled to question his or her opponent,'" going on to cite three cases, only one of which involved an issue like that here. That case is *Doe v. Baum* (6th Cir. 2018) 903 F.3d 575 (*Baum*), more on which below.

Doe's brief continues with citation, without discussion, of 10 cases of boilerplate and platitudes discussing the importance of demeanor. Then, after discussing the importance of cross-examination demonstrated in two movies—*A Few Good Men* and *My Cousin Vinny*—the brief goes on to discuss at length *Barber v. Page* (1968) 390 U.S. 719, 721, a criminal case where defendant was charged with kidnapping and robbery, and included discussion of the Confrontation Clause of the Sixth Amendment of the United States

17

Constitution.  As to this, *Boermeester* is apt:  "While live adversarial questioning may be considered essential in the context of a criminal trial [citation], there is no absolute right to a live hearing with cross-examination in administrative proceedings, even where constitutional due process applies."  (*Boermeester*, *supra*, 15 Cal.5th at p. 93.)

But *Boermeester*—which Doe's brief hardly mentions other than to note it dealt with private universities—is apt for several other of its observations, discussing principles that are relevant here.  For example, and though the case was addressing fair procedure, not due process, the Supreme Court noted, "The principles of common law fair procedure are similar to those of constitutional due process in that they are flexible and context specific.  Under either concept, the precise procedures necessary to provide a complainant with a meaningful opportunity to be heard 'depend[ ] largely on "the nature of the tendered issue." ' "  (*Boermeester*, *supra*, 15 Cal.5th at p. 87.)  And the Court noted, Senate Bill 493 was "noteworthy" in that it did "not require universities to conduct live hearings featuring cross-examination of the accuser and other witnesses."  (*Boermeester, supra,* 15 Cal.5th at p. 91.)  To the contrary, the Senate Bill "gives universities the discretion to decide whether 'a hearing is necessary . . . .' "  (*Ibid.*)

None of that is even acknowledged, let alone discussed, by Doe here.

Doe asserts that the complaining witnesses must attend the hearing in person, to be there to be cross-examined "by the Hearing Officer or a neutral third-party."  Apparently recognizing the concern the law has to accommodate a sexual assault victim in the university setting, the procedure Doe would envision is this:  "The University could have accommodated [Roe] 1 and [Roe] 3 from any purported discomfort or irritation by conducting the proceedings remotely using a remote technology that would have allowed

18

them to hide John Doe from their view; requiring written questions to be submitted before the hearing to ensure that the questions were not harassing, repetitive, irrelevant, or unduly time consuming; having the questions asked by the Hearing Officer or a neutral third-party; and permitting the parties to attend the hearing only for their own testimony."

But if the procedure envisioned by Doe—the hearing officer asking questions that are "not harassing, repetitive, irrelevant, or unduly time consuming"—would be due process, a fortiori was the rigorous cross-examination the Roes endured at the preliminary hearing, where the Roes were grilled for several hours, in a criminal proceeding, under oath, by an experienced attorney whose stated objective was to demonstrate the Roes' lack of credibility. Specifically:

Roe 1 was first cross-examined about possible biases against the fraternity system and the mandatory sexual harassment training she received at the University and her sorority. As to the incident itself, Roe 1 was questioned about her "hooking up" with Doe; about her sobriety; about particular sex acts and whether she enjoyed them; and why she didn't leave Doe's room sooner. She was asked detailed questions about the bruises in the photographs, and how she claimed to have bruising on her breasts. Doe's attorney also had Roe 1's text messages to Doe, and asked questions about them for some eight pages seeking to show claimed inconsistencies in her story. The attorney also questioned—for some 24 pages—Roe 1's reporting of the incident and discussions with others about it.

The 70 pages of Doe's attorney's cross-examination of Roe 3 was similar, starting with her pre-incident relationship with Doe, her breakup with her boyfriend earlier on the day of the incident, and her drinking that day. The attorney questioned Roe 3 about prior statements to law

19

enforcement; who was near the site of the assault and what they were doing; and interactions with a witness who approached her and Doe. The attorney asked about Roe 3's text messages with Doe and pressed her on whether she had encouraged a witness to provide false testimony and whether she had punished the witness for refusing to do so.[7]

The approach Doe envisions pales by comparison.

Eschewing any reference to all of that, Doe's brief asserts that his attorney "was not fully cross-examining" the Roes at the preliminary hearing. Doe does not explain how this assertion supports his position. But beyond that, the fact is that Doe's attorney had an incentive at the preliminary examination—shielding Doe from serious felony charges—that far exceeded any incentive in the University proceeding. Put slightly differently, expulsion from the University is one thing, years in prison is quite another. In short, Doe's attorney had every incentive to discredit Roe 1 and Roe 3, just as Judge Whitman noted: Doe has not "shown that his attorney 'pulled punches' or failed to adequately examine Roe 1 or 3 on a material issue."

In addition to all that, and inconsistent with his criticism of his attorney's cross-examination, Doe's brief asserts that "[t]he testimony given

---

[7]   Doe's attorney's cross-examination was not only rigorous, at times it was argumentative, as the these questions reflect:

"Let me see if I got this right. You're saying this man was aggressive with [you], he punched you in the face, he punched you in the ribs, and he actually tore a shirt that the police were interested in, and they at some point told you never mind, we're not interested in that? [¶]. . . [¶] . . . Is that your testimony?"

"During this time did you ever scream?";

"And you didn't yell out to the guy who was in the room?";

"[I]t seems like whenever [the prosecutor] asks you a question about a text you sent to [witness] you have a clear memory of it, but when I do, you don't, is that true?"

during the preliminary hearing prompted the prosecution to drop all felony charges against John Doe."

As to Doe's assertion that additional evidence surfaced during the University's investigation, Appendix E permits all parties to a disciplinary proceeding to "propose questions for the investigator to ask the other party and witnesses." After receiving all of the evidence that had been collected during the investigation, and presented with the opportunity to propose additional questions to be asked of the Roes, Doe declined to do so.[8]

One last comment on Doe's position that the accuser must attend the hearing is the effect it would have if, as in *Boermeester*, the accuser recanted or did not attend because she was in another country, or, as here, declined, or for any other reason. The effect, as Doe would have it, is that the accused, even if guilty, would remain at the University. That cannot be.

Finally on this issue, a few words about the Sixth Circuit case of *Baum*, *supra*, 903 F.3d 575, the one case that appears to hold that an accuser must attend the hearing. The case is, of course, not binding on us (see *Lorenzo v. San Francisco Zen Center* (2025) 116 Cal.App.5th 258, 276, review granted Feb. 11, 2026, S294565), and we have not hesitated to reject federal circuit court decisions in the past when we have not found their reasoning persuasive. (See, e.g., *People v. Mackey* (2015) 233 Cal.App.4th 32, 87 ["we disagree with the Ninth Circuit's test and are not bound to follow it, even on constitutional questions."].) *Baum* is also an outlier, its holding rejected in numerous other cases. (See, e.g., *Haidak v. University of Massachusetts-*

---

[8]    Doe's brief asserts at the investigation hearing he presented at his closing statement "and also listed some of the questions he would have asked the complainants if they had made themselves available for questioning at the University hearing."

21

*Amherst* (1st Cir. 2019) 933 F.3d 56, 69–70; *Doe v. Haas* (E.D.N.Y. 2019) 427 F.Supp.3d 336, 351 [citing *Haidak*].)

**The Delay Was Not Error, Let Alone Prejudicial Error**

Doe's second argument reads as follows: "The delay in this case was unreasonable. Appendix-E stipulates that Title IX investigations should typically be completed within 60 to 90 business days of the notice of charges unless an extension is granted for good cause. In . . . Doe's case, the investigation lasted a total of 692 days (1 year, 10 months, and 22 days), from June 4, 2019, to April 26, 2021, significantly exceeding the policy time's restriction."

Maybe so. It does not avail Doe.

Citing numerous extensions between August 2019 and January 2021, Doe candidly acknowledges that the requests were granted " 'in part because of the number, complexity, and severity of the allegations; and in part because of complications arising from unforeseen changes in the work environment and the Former Investigator's personal circumstances resulting from California State, Alameda County, and University directives related to the COVID-19 pandemic.' " There was, of course, also the fact that there was a serious criminal case pending against Doe until February 2021.

As Doe also acknowledges, "Appendix E" permits the investigator to extend the duration of the investigation for good cause. Such cause was present here. The investigation involved three separate instances involving three different students over a span of some 17 months. And, as the investigation report references, 13 other witnesses were interviewed, along with multiple interviews with Doe and the three Roes—25 interviews in

22

total.[9]  Finally, and as Doe also acknowledges, much of the investigation was during the heart of the COVID-19 pandemic.  We discern no error.

But even if there were, it would not assist Doe, as any such error would necessarily be harmless.  Article VI, section 13 of the California Constitution states:  "No judgment shall be set aside, or new trial granted, in any cause, . . . or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice."  Code of Civil Procedure section 475 is similar, stating that "The court must, in every stage of an action, disregard any error, improper ruling . . . , which . . . does not affect the substantial rights of the parties.  No judgment, decision, or decree shall be reversed or affected by reason of any error, ruling, instruction, or defect, unless it shall appear from the record that such error, ruling, instruction, or defect was prejudicial . . . . There shall be no presumption that error is prejudicial, or that injury was done if error is shown."

Doe's only claim of prejudice is that "[t]welve of the witnesses who had been accepted to testify at the hearing either declined to participate or did not respond to outreach attempts, likely because they had graduated and were no longer students at UC Berkeley."  Passing over the fact that the University could not have compelled any reluctant witness to attend, Doe does not identify any of the witnesses he refers to, why he contends that any purported delay caused them not to attend the hearing (or even that he sought to have them testify), or how their testimony could have helped his case.  Nor has he identified any credibility disputes between his version of

_____

[9]    There were also numerous efforts to interview eight other witnesses, all without success.

23

events and the version these unidentified witnesses provided during the investigation.

## DISPOSITION

The judgment is affirmed.

_____

RICHMAN, J.

We concur.

_____

STEWART, P.J.

_____

MILLER, J.

(A170234P)

Alameda County Superior Court

Honorable Michael Markman

Counsel:

Hathaway Parker, Mark M. Hathaway, Jenna E. Parker and Mark W. Allen for Plaintiff and Appellant.

Venable, Jean-Paul Cart for Defendant and Appellant.